530 So.2d 1011 (1988)
Gerald Kip GEDDES, Appellant/Cross Appellee,
v.
Gudrun Margrit GEDDES, Appellee/Cross Appellant.
No. 4-86-2084.
District Court of Appeal of Florida, Fourth District.
August 31, 1988.
*1012 Gunster Yoakley Criser & Stewart, P.A., and Jane Kreusler-Walsh and Larry Klein of Klein & Beranek, P.A., West Palm Beach, for appellant/cross appellee.
Neil B. Jagolinzer of Christiansen, Jacknin & Tuthill, West Palm Beach, for appellee/cross appellant.
ANSTEAD, Judge.
This is an appeal from a final judgment of dissolution of marriage. The appellant, Gerald Geddes, challenges the denial to him of a special equity in a certain parcel of real property, while his former wife, the appellee, Gudrun Geddes, cross appeals the refusal of the trial court to award her permanent alimony. We affirm on both issues.

BACKGROUND
The parties were married in December 1975 when Gudrun was 36 and Gerald 29, and separated in August 1984 when Gudrun was 45 and Gerald 38. They had no children. Both enjoy relative good health. During the marriage the parties enjoyed a comfortable lifestyle. They wintered in the Palm Beach area, summered in Montauk, N.Y., and had homes in both places. Gerald has never worked, while Gudrun was completely self-sufficient before marrying Gerald. Gerald's income before and during this marriage has been derived from trusts. In 1975, the first year of the marriage, his income was $59,000. This income increased to $97,000 in 1982 when his father died and he inherited his father's portion of his grandfather's trust. At the time of trial, there was evidence that Gerald had an income in excess of $15,000 per month and assets totalling $1 million.
Gudrun was born in Germany and lived there until she was 21 years old. Her educational background includes attendance at the University of Hamburg from age 14-18 where she took engineering courses but did not earn a degree, and accounting courses through a church exchange *1013 program taught in German at St. Paul University in Minneapolis from 1961-1964. For ten years she worked as a bookkeeper. When she met Gerald in 1974, she was working as a butcher for a supermarket in Montauk, New York. After the parties moved to Palm Beach, she was employed as a bank teller. The evidence was disputed as to whether she quit that job of her own volition, or whether she did so at her husband's request. Other than her self-sufficiency and a mobile home in which the parties lived before their marriage, Gudrun came into the marriage without substantial assets.
The trial court found that during the marriage the couple had acquired three parcels of real estate, all titled in their joint names: 1) Montauk residence valued at $230,000 and having a mortgage balance of $25,000; 2) 2814 North Flagler Drive, West Palm Beach, valued at $210,000 owned free and clear; and 3) 2900 North Flagler Drive, valued at $350,000 and having a mortgage of $195,000. Gerald contended at trial that he should be awarded all three properties because the funds used for the acquisition of the properties came from his family trust. The trial court denied Gerald's claim for a special equity in the three properties and found that the greater weight of the evidence demonstrated that he had intended to give his wife a one-half interest in the properties. The trial court awarded Gudrun exclusive use and possession of the 2900 North Flagler home for three years and required Gerald to pay the mortgage, real estate taxes, and insurance on the home for that period. The property was then to be sold and the proceeds equally divided after paying the mortgage and costs of sale. The court ordered that the Montauk and 2814 North Flagler home be sold immediately with the net proceeds equally divided between the parties. Gudrun was awarded the furnishings in the 2900 North Flagler Drive home and Gerald was awarded all the furnishings in his apartment, the Montauk home and the 2814 North Flagler Drive home. In addition, Gudrun was awarded $4,000 a month as rehabilitative alimony for 73 months, Gerald's half interest in their $2,000 1976 Audi, and attorney's fees which were determined to be $35,000.

GERALD'S SPECIAL EQUITY CLAIM
On appeal, Gerald challenges only the refusal of the trial court to award him a special equity in the Montauk home which, he claims, was purchased before the marriage with funds from outside the marriage (i.e., his inheritance). The supreme court in Ball v. Ball, 335 So.2d 5 (Fla. 1976), stated that, "[I]n the absence of any showing by either spouse in the marriage dissolution proceeding as to why one should be awarded more than an equal proportion of real property held as tenants by the entireties, record title speaks for itself." Id. at 7 and 8. Either spouse can attempt to establish a "special equity" in the property on the basis of an extraordinary contribution toward its acquisition, either financially or through personal industry and service to the other party. That special equity can be avoided, however, by contradictory evidence that a gift was intended at the time of the transfer into joint ownership. "In using record title as the touchstone and requiring some evidentiary showing beyond that for an award other than an equal division, it becomes unnecessary to use judicially-created presumptions of any sort in these proceedings." Id. at 8.
In Marsh v. Marsh, 419 So.2d 629 (Fla. 1982), the supreme court acknowledged the difficulty faced by a court in resolving disputed issues of fact relating to the donative intent of a grantor who titles property in joint names. In Marsh, the wife owned the marital home prior to the marriage and paid all the mortgage payments and property taxes. She married her husband in October 1978 and in December 1978 she transferred her home from her sole ownership to that of a tenancy by the entirety with her husband. Two months later the couple filed for dissolution. At trial, the wife alleged that the property had been transferred solely to provide a home for her children from a previous marriage and should have been transferred back to her in the event of divorce. Predictably, her husband claimed that the transfer was a gift. *1014 The trial judge, finding direct conflict in the couple's testimony found for the husband and ordered partition and sale of the home. The district court applying Ball reversed the trial court's holding that the record lacked credible evidence to support the trial court's ruling that the wife had intended a gift. The supreme court in turn quashed the decision of the district court as being an improper substitution of its opinion for that of the trial court and reinstated the trial court's decision denying the wife a special equity. The court noted that when the intent of the grantor is included within the deed or some other contemporaneous document, the problem of proof is not as severe as when the evidence of intent comes from the testimony of the litigants and their supporting witnesses. Under the latter situation, the testimony is subject to obvious bias and the witnesses' credibility is naturally in question. The court concluded:
When, as here, the grantor's intent is to be determined from the conflicting testimony of the parties, it is the responsibility of the trial court to evaluate the weight and credibility of that testimony and to arrive at a determination. [emphasis added]
Marsh, at 630.
While conceding that the the Montauk residence was titled in the parties' joint names, Gerald claims that he jointly titled the property solely for estate purposes, and that he had not intended to create a vested interest in his wife. The deeds in evidence have no reservations or limitations upon them to indicate that the transfer was only to take place in the event of Gerald's death, and except for his assertion at trial, there was no testimony or evidence to support Gerald's claim that he had been motivated to jointly title the property for estate purposes only.
The couple lived together in Gudrun's mobile home a year before marrying in December 1975. Gudrun testified that Gerald was unhappy living in her mobile home because it was small and he didn't like all the people around him. Together they found the Montauk property. In October 1975, Gerald paid the $50,000 down payment on the property with his inheritance and took out a $30,000 mortgage. In that same month, he took out a construction loan. The parties married in December 1975 and the house was completed in the Spring of 1976. Upon completion of the house, Gerald converted the construction loan into a regular mortgage and, initially, both the mortgage and the note were in his name individually. However, just a couple of months later, in July 1976, Gerald titled the property in their joint names. Although he testified that he did it only for probate purposes, he denied ever having told Gudrun or anyone else that this was his motivation.
Gudrun questions the credibility of Gerald's testimony that he had titled the property in joint names only for probate purposes. Gudrun testified that Gerald referred to the properties as theirs and never indicated to her that any of the properties were to be his individually. She observes that Gerald is the beneficiary of several trusts and, therefore, he would have been aware of the option of utilizing a trust procedure to title the real estate, if, in fact, he wanted Gudrun to have an interest in the property only upon his death. Indeed, during the marriage, Gerald created a trust for her benefit funded by money he had inherited from his father. In addition, it is undisputed that Gudrun performed substantial physical work upon the Montauk residence along with all the other properties the couple owned. For example, she testified that at the Montauk residence, she cut down and removed trees, installed parquet floors, built a 15' bar, installed cement tiles for a 300' walkway to the pool and lined it with gravel and railroad ties, carried several truckloads of sand in a wheelbarrow to the pool area to install tiles in the pool, and performed other major construction tasks. According to Gudrun, much of the work was done without Gerald's help as he complained of backaches.
In the face of the conflicting evidence before him, we believe the trial judge was entitled to conclude that at the time of the conveyance of the home into joint ownership, Gerald intended to make a gift of a *1015 half-interest in the home to his wife. Marsh v. Marsh. As has been previously noted, the mortgage and improvements were paid for with trust disbursements received during the marriage, and the wife contributed significantly to the value of the property by performing substantial labor to make capital improvements. In determining whether at the time Gerald transferred the Montauk property into joint ownership he had intended to make a gift of the property to Gudrun, the trial court could also consider that the property was purchased just two months before the marriage while the couple was living together, and that Gerald titled it in their joint names within the first six months of marriage. The couple spent every summer in residence there and Gudrun did extensive work on the house while under the impression that the home was jointly owned. In addition, the trial court could consider undisputed testimony that the only funds the couple ever acquired during their marriage derived from Gerald's trust income and inheritances and that under the trust from which he derived his income, his wife would receive no benefits or income upon his death.[1] We also note that approximately 78% of the $230,000 value of the house is represented by: 1) mortgage payments and improvements which were paid for with trust income received during the marriage; 2) appreciation in the value of the property due to the substantial labor contributed by his wife; and 3) inflation and/or other factors which increased the value of the property during the marriage. Accordingly, Gerald does not fit exactly within Ball's category of prima facie entitlement to a special equity in the property, and we find no error by the trial court in denying the claim of special equity.

PERMANENT ALIMONY
The facts of the instant case present a very difficult question as to whether the award of rehabilitative rather than permanent alimony was proper. Initially, we reject Gerald's claim that in resolving the alimony issue, the trial court was not entitled to consider Gerald's trust income because the income came from non-marital assets. As noted above, the trial court awarded substantial rehabilitative alimony, obviously to be paid from the trust income. We believe it was appropriate for the trial court to consider the trust income for purposes of determining the alimony issue when it was demonstrated that the income was anticipated to be permanent during Gerald's lifetime, and the income was shown to have been relied upon to support the parties throughout the marriage.
Gudrun was awarded the following in the Final Judgment:
1. Exclusive use and possession of the couple's $350,000 home at 2900 N. Flagler Dr. for 3 years from the date of judgment during which time Gerald shall pay mortgage, taxes and insurance on the home. After 3 years the house is to be sold and after first mortgage is paid and Gerald is reimbursed for one half the mortgage, tax and insurance payments he made, the couple will split the proceeds equally. [At the time of final judgment the property was encumbered by a $195,000 mortgage.]
2. One half the net proceeds from the court ordered sale of the $210,000 home at 2814 N. Flagler Drive. [Property owned free and clear.]
3. One half the net proceeds from the court-ordered sale of the $230,000 home in Montauk. [Property encumbered by $25,300 mortgage balance.]
4. All the furnishings and furniture at 2900 N. Flagler Drive.
5. Husband's one half interest in the $2000 Audi automobile.
6. Rehabilitative alimony of $4000/month for 73 months (August 1986 through September 1992). [To terminate *1016 upon either party's death or wife's remarriage.]
In addition to these awards, Gudrun was able to keep her 1963 Bentley (estimated in her financial affidavit to be worth $7500), $30,000 worth of jewelry, furs and clothing, and she was awarded attorney's fees of $35,000.00. As a brief explanation of this decision, the trial court stated in the final judgment:
The parties were married on December 31st, 1975 and separated August 1984. No children were born of the marriage. The marriage is irretrievably broken.
The Wife is presently 45 years of age and Husband is 38 years of age. Both parties are in good health.
Although the Wife has not worked much during the marriage, she has skills which would enable her to find gainful employment and with some rehabilitation she can become self supporting.
The Husband has never worked. His sole source of funds during the marriage was the Husband's inheritance.
A trial court's decision with regards to the award of alimony is reversible only upon a showing that no reasonable person could arrive at such a result. Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980). The criteria to be used in determining whether to award alimony include the parties' earning abilities, their separate financial estates, age, health, education, the duration of the marriage, the age and number of children, and the standard of living enjoyed during the course of the marriage. Id. As may be expected, each party cites the factors from Canakaris supportive of their position. Gudrun claims that this is a simple case where the husband has an obvious ability to pay and she is entitled to be supported on a permanent basis in the high standard Gerald's income can provide. Even if she were able to establish herself in a catering business as Gerald suggested below that she could do, she claims that there is no evidence that her pursuit of that career could produce the level of income received by Gerald from his family trusts. On the other hand, many of the relevant factors mentioned in Canakaris would appear to support the trial court's determination. Among those are the prior self-sufficiency of the wife, the good health and relative young ages of the parties, the other assets and income provided the wife, the lack of children, and, arguably, the length of the marriage. Considering all the pertinent considerations set out in Canakaris, and especially the other financial awards made to the wife, we do not believe the trial court abused its discretion in denying her permanent alimony. Also see Kuvin v. Kuvin, 442 So.2d 203 (Fla. 1983). (The husband's superior earning ability is not necessarily the controlling factor in deciding whether to award permanent or rehabilitative alimony.) Our conclusion is predicated primarily upon the admonition in Canakaris concerning the substantial discretion vested in the trial court in working out an equitable dissolution scheme.
Since the supreme court's landmark decision in Canakaris, the dissolution law of Florida has undergone a remarkable period of enlightenment and stabilization. To be certain there remain issues that are difficult to resolve, such as the anticipated move of a custodial parent to another state, or the relevancy of a claim of marital misconduct on the issue of alimony. However, for the most part there are now settled, objective criteria in place that result in consistent and fair decision-making in the trial courts. No-fault divorce, at least in terms of the grant of dissolution itself, is firmly in place and has been for years. The equitable distribution of marital assets initially called for in Brown v. Brown, 300 So.2d 719 (Fla. 1st DCA 1974), became a reality with Canakaris, and has been strengthened by the recent enactment of an equitable distribution statute by the legislature. The issue of child custody has received enlightened treatment by enactment of the shared parental responsibility law and the frequent use of guardians ad litem for children involved in custody disputes. The national legislature has positively intervened in the area of child support, and that intervention, combined with aggressive support enforcement at the trial court level, has resulted in substantial *1017 gains for children and custodial parents faced with absent or uncaring parents attempting to avoid their most basic responsibilities. Court supervised mediation is also proving a peaceful alternative to the adversary resolution of emotionally-charged dissolution disputes.
While reluctant to suggest an exception to this generally positive and stable picture, it appears that the issue of permanent alimony remains a troubling one. It is true that this court, in McAllister v. McAllister, 345 So.2d 352 (Fla. 4th DCA 1977), and the supreme court, in Canakaris, as well as the legislature, have provided some objective guidelines for the trial court's use in resolving alimony issues. For the most part, those guidelines do an effective job of producing a fair result, especially for those cases at opposite ends of the marital spectrum: short marriages of partners with relatively equal earning abilities and no children, and long term marriages with children and partners with substantial disparities in earning ability. There remain, however, numerous marital situations that fall somewhere on the factual spectrum between these extreme examples, and which present difficult questions for trial courts to resolve. Appellate courts have fared little better in recognizing which of these cases should be left alone under the abuse of discretion standard set out in Canakaris, and which merit intervention pursuant to the objective criteria set out in the same case.
Modern alimony really has very short historical roots.[2] To a great extent the courts' struggle with the modern day concept of alimony simply reflects society's own struggle with the problem of providing equal economic opportunities to all, and the related concept of individual rights in the context of marriage and family. Ideally, in a society of equal rights and opportunities, all adult members of society should be able to take care of themselves. This in fact is a commendable goal and is reflected to some extent in the family law concept that parents are responsible for the care and support of their children only until they reach the age of majority. We have come a long way since a wife was considered little more than the husband's property and completely dependent upon him for support. We have even come a long way from the time a woman, while not considered property, was treated as a second-rate citizen in terms of full participatory rights in our society. As in the case of discrimination involving other deep-rooted biases, however, substantial problems remain unresolved. While our society espouses the ideal of equal rights and responsibilities everywhere, the reality, especially in the workplace, does not always mirror the ideals set out in the lofty slogans. In other words, women have not yet caught up with men in the workplace and the marketplace.
The present day problem of resolving alimony claims requires the balancing of a number of legitimate concerns. For example, the concern that one adult should not be compelled to support another adult must be weighed against the reality that many spouses, primarily because of their participation in the marriage partnership, have seen their opportunities and abilities to be self-supporting diminish, while at the same time the opportunities and abilities of the other spouse have been enhanced. This, in fact, is a description of the typical marriage where the male, in the role of provider, pursued a career, while the female managed the home and raised the children. A breakup of that marriage after the children are grown will ordinarily result in the inequity of a displaced wife with no readily marketable skills facing an unfamiliar and competitive commercial environment, at a point when her husband is just reaching the peak of his earning ability. The need for some adjustment to compensate for such an inequitable situation is self-evident. That scenario, and others like it, should ordinarily result in an award of permanent *1018 alimony since those entering into a marriage partnership must share not only the benefits and successes of the relationship, but also the risk of failure and the economic consequences to the parties of such failure. Identifying any resulting inequities and working out solutions to compensate for those inequities is a difficult task for a judge presiding over dissolution proceedings.
Between the typical marriage where one spouse provides complete financial support for the family, and one where both spouses are financially self-sufficient, lie a myriad of factual situations. In many of those cases, the standard formula for determining alimony, that of need and ability to pay, simply does not work. For instance, need and ability to pay may not be a useful formula in resolving alimony claims in a short-term marriage involving young spouses with no children where no genuine inequities are created by dissolution. In that case, virtually all would agree that a permanent support obligation by one spouse to the other outside of marriage would not be appropriate notwithstanding the disparity that may exist in their respective incomes. The same may be true, but becomes more difficult to decide, if we consider the same short-term marriage but advance the marrying parties to middle age or even older. Why is this so? Could courts be utilizing alimony in some instances to compensate for society's own inability to provide meaningful opportunities for self-support or its inability to care for those who cannot take care of themselves? Is it fair or reasonable to do so? We should keep these questions in mind when addressing the issue of alimony because the ability of the courts to come up with answers to the alimony issue will continue to be affected by the ability of our society to resolve the economic and social issues related thereto. Until society makes progress in this area, courts charged with the task of balancing the equities will be left to struggle with these strongly competing concerns. Hence, the wisdom of the broad grant of discretion made by the supreme court in Canakaris.
In this case we have decided that the trial court did not err in failing to award permanent alimony to a relatively young woman who had been self-supporting all of her adult life before this nearly nine-year marriage, and who left the marriage in approximately the same condition. That is, no skills were lost, and no children were born to be raised by her. In fact, she leaves this marriage considerably wealthier than when she entered it. Whether she would have fared even better financially had she continued to pursue a career as a bookkeeper, a butcher, a caterer, or chosen another path altogether, is subject to speculation. Is this decision of the trial court exactly what the members of this panel would have done? Perhaps not. But is it within the range of discretion granted in Canakaris, that of reasonable persons? Probably. In any case, we so hold and affirm.
SALMON, MICHAEL H., Associate Judge, concurs.
GLICKSTEIN, J., concurs specially with opinion.
GLICKSTEIN, Judge, concurring specially.
I write for two reasons, the first of which is to compliment our colleague on his analysis. The second is to advise that my concurrence does not extend to approval of the fact to which our colleague alludes by way of dicta; namely, that children in this judicial district  unlike those in the First District  are automatically deprived of support when they reach 18, even if still in high school and totally dependent upon their parents.
NOTES
[1] It should be noted that in March 1983, Gerald created a trust funded with income from the principal he had inherited in his mother's will. The purpose of the trust was to provide income to his wife in the event of Gerald's death and at the time of trial, it was worth approximately $340,000. However, the trust would not be available in the event of the couple's divorce. In Gerald's own words, in the event of their divorce, "it's a revocable trust and I can pretty much do what I want with it."
[2] See Judge Ervin's opinion in Cornelius v. Cornelius, 382 So.2d 710 (Fla. 1st DCA 1979). Also see Beyond Individual Privacy: A New Theory of Family Rights, Rutherford, University of Florida Law Review, Vol. 39, 627, 648 (1987); The Founders on Families, Law, University of Florida Law Review, Vol. 39, 583 (1987); Alimony in Florida: No-fault stops at the Courthouse door, University of Florida Law Review, Vol. 28, 521 (1976).