795 So.2d 977 (2001)
Jesse J. NELSON, Appellant/Cross-Appellee,
v.
Betty J. NELSON, Appellee/Cross-Appellant.
No. 5D99-826.
District Court of Appeal of Florida, Fifth District.
June 29, 2001.
As Corrected on Grant of Rehearing October 1, 2001.
*979 Michael R. Riemenschneider of O'Brien, Riemenschneider & Kancilia, P.A., Melbourne, for Appellant/Cross-Appellee.
Scott Krasny of Krasny and Dettmer, Melbourne, for Appellee/Cross-Appellant.
SHARP, W., J.
The former husband Jesse Nelson (Jesse) appeals from a final judgment of dissolution rendered February 8, 1999, and the former wife Betty Nelson (Betty) cross appeals. Jesse raises several points on appeal, which we summarize: (1) the trial court's valuations of certain marital assets are not supported by substantial competent evidence, and it resulted in an inequitable distribution of assets to him, (2) the trial court abused its discretion in requiring him to pay Betty monthly sums in excess of his ability to pay, and (3) the trial court abused its discretion in requiring him to maintain life insurance to secure his alimony obligations to Betty. We agree Jesse is entitled to some relief as discussed below.
Betty argues on her cross appeal that the trial court erred in not granting her a perfected security interest in the stock of Nelson Engineering and that she should have been awarded all of her attorney's fees, based on the disparity of the parties' incomes. We affirm the trial court on the cross appeal.
The Nelsons had a long-term marriage; thirty-eight and one-half years. They were blessed with five children, all adults at the time of the dissolution. Jesse graduated from high school, but Betty did not complete high school. He was 65 years old at the time of the dissolution and Betty was 61. Betty had suffered various health problems, but at the time of the dissolution was doing well. Jesse was in good health with no plans for retirement.
The parties married when both were very young and had few assets. The considerable wealth and assets they accumulated over the time of their marriage were properly classified by the trial court as marital. During the latter part of their marriage, they enjoyed a high standard of living, which encompassed a summer home in Tennessee, vacations overseas, yachts, and new cars. The source for the parties' good fortune and income was and is Nelson Engineering Company, which the parties jointly owned.
The parties separated in March of 1995 and Betty filed a petition for dissolution in November of 1996. The trial court selected December 31, 1996 as the date upon which to value Nelson Engineering, as well as the parties' certificates of deposit. It *980 also selected March 14, 1996 as the date chosen to value other corporations and assets owned by one or both of the parties. The court explained this was because they were controlled and managed by Jesse, and the court had in evidence a financial statement dated March 14, 1996, sworn to as accurate by Jesse. No other proof of value was presented at trial, of values for those assets close to the date of the parties' separation. It chose to accept the values shown on the financial statement. The parties were able to stipulate and agree to the valuation of the real estate properties owned by them.
The court distributed the parties' assets as follows:

 Jesse: Betty:
Nelson Engineering 1,520,000 All certificates of deposit 215,000
Government Bonds 58,000 Retirement Plan 123,000
A.G. Edwards Account 113,000 IRA w/A.G. Edwards 14,000
Ginnie Mae bonds 125,000 Funds removed from 6,000
Blue Water 330,000 Grandkids account
Excel Tel Services 300,000 Bass Boat 2,500
Pexin Farms 211,000 1989 Jaguar 11,300
Retirement Plan 244,000 Personal Property 20,000
IRA w/A.G. Edwards 14,000 Melbourne Property:
Funds Grandkids account 10,000 Timeshare 6,000
Pontoon boat 2,500 ¼ acre, Bay County, FL 7,425
31 foot Scarab boat 17,000 Lots 455, 456 InletBch. Heights 20,000
1985 Jaguar 8,500 Lot 106, Riviera Beach 4,350
1992 Corvette 24,000 Marital Residence2781 181,000
Property; 253 Terrance Ave., 67,500 Pineapple Ave., Melbourne
 Melbourne ($80,000 less (300,000 less mortg. 118,000)
 mortg. 12,500) Part of Lots 3 & 4, Block F, 189,000
Funds received 113,000 Almar Subdivision
 New England Life (250,000 less mortg. 61,000)
 Insurance policies 42 acres, sections 34, 35, 21,500
 Levy County, FL
TOTAL: $3,157,500 Sections 34, 35 3,000
 Levy County, FL
 (22,000 less mortg. 19,000)
 Lots 12 & 14, Buttons Subdiv. 100
 Seminole County, FL
 Tract 8, Chas. Hedrick Property
 Sevier County, TN 14,700
 Residence; Sevier County, TN 103,600
 Lot & Furnishings, as above 10,000
 10.5 acres, Sevier County, TN 35,000
 Harrisburg Bridge property
 Sevier County, TN 12,000
 Tracts 1 & 2, Jones Cove Rd.
 Property; Sevier County, TN 102,400
 ½ interest in Tracts 4-9,
 Cocke County, TN 34,500
 TOTAL: $1,135,37

However, these totals do not reflect the court's additional awards to Betty to equalize the distribution of marital assets. It required Jesse to pay Betty $11,500.00 in cash on January 1, 1999, and to execute a promissory note in the principal amount of $1,000,000.00 with interest at 7.75%. Based on the court's valuations of the marital *981 assets, Jesse received $2,158,500.00 and Betty received $2,144,375.00.

I. VALUATION OF MARITAL ASSETS.

A. Nelson Engineering Company.
At the time of the parties' dissolution, the parties' most valuable asset and the primary source of their income was Nelson Engineering Company. Each owned 50% of the stock in the company. Jesse began the company in 1981. Betty was at first reluctant to have him leave his salaried job. However, she also worked for the company doing clerical and administrative jobs, until she retired in 1993. After she retired, the company continued to pay her a salary of $110,000.00 through 1998. Three of the parties' sons and a daughter also worked for the company. Jesse was the company's CEO, through the time of the parties' dissolution. He worked long hours and traveled extensively to solicit business and maintain client contacts.
The company provides engineering and design services for telecommunications systems and installs and constructs systems for voice and data transmission networks. It employs a large number of employees and managers. Its maximum work force was 140 in 1993-94, and at the time of the dissolution it employed 70, exclusive of family members. The biweekly payroll for the company was $75,000.00. Gross receipts for the company in 1993 were $3,081,124.00; in 1994 they were $3,297,500.00; in 1995 they were $3,218,383.00, and in 1996 they were $3,699.996.00.
The trial judge valued the company at $1,520,000.00, using the excess earnings method testified to by the two expert witnesses at trial as the most appropriate method to value this company.[1] But he increased the value beyond that established by the witnesses, because of various personal expenses the company had been paying for the parties, which were not taken into account by the witnesses in their calculations. The issue for this appellate court is whether or not there was sufficient competent evidence to support the trial court's finding on valuation.[2]
Jesse's primary argument on appeal is that both expert witnesses' testimonies should have been rejected by the trial court because the excess income approach to valuation of the company included a significant component for "goodwill" or "going concern value"[3] and neither expert established that this intangible existed separate and apart from Jesse's reputation *982 and continuing work and contribution. He urges that pursuant to Thompson v. Thompson, 576 So.2d 267 (Fla.1991) and Young v. Young, 600 So.2d 1140 (Fla. 5th DCA 1992) that the existence of an intangible known as "goodwill" or "going concern value" must first be established as an entity which stands alone absent Jesse' continuing presence. Only after that is accomplished can it be included as a marital asset in the context of a dissolution case.
The difficulty for Jesse in taking this position on appeal is that in this case his trial counsel failed to raise this issue at trial, or on motion for rehearing. In fact, Jesse's own expert witness, Flavin, included in his valuation a sum for goodwill or "going concern value" close to the amount calculated by Betty's expert witness, Arnold. It appears this issue has been waived. See Williams v. Williams, 683 So.2d 1119 (Fla. 3d DCA 1996).

B. Valuations of Business Assets Distributed to Former Husband; Blue Water, Excel Tel Services, Pexin Farms.
The trial court opted to use March 14, 1996, to value the parties' assets, which was after the parties had separated but before the petition for dissolution was filed. Blue Water[3] and Excel Tel Services[4] were valued on the Financial Statement at $330,000 and $300,000, respectively, as of March 14, 1996. The reason the trial court gave for selecting that date was two-fold. First, neither party presented substantial competent evidence as to values close to that period of time, other than a financial statement executed by Jesse on that date. Neither party offered a better solution to the date of valuation of marital assets. In view of these facts, we cannot say the trial court abused its discretion in doing so.[5]
In addition, the trial court was faced with a situation where, between 1996 and 1997, the values of these businesses had greatly diminished and no one accounted for where the capital assets and/or cash had gone. The trial judge explained
I kind of get the feeling that a lot of money that exists in certain corporations in March of 1996 found a way into different entities in October of 1997 and it appears that numbers were a couple of hundred thousand less in 1997 where the business went bad or moneys were hidden or whatever, there's a lesser amount. I guess my feeling is, and I will give you (the parties) a chance to argue in closings or follow up, is maybe what will be easiest for the Court to figure out the assets of the parties in the late '95 early '96, and use that as a basis for equitable distribution other than the real property which have stipulations on and other than the corporation which you have a December 31, 1996 statement and other of the CDs which are traceable, *983 because I'm not sure, and maybe you can suggest otherwise, how I can possibly track all this money moving along between early 1996 and the present date. Maybe what will be easiest for the Court and fairest for both sides is for the Court to figure out what assets these parties had in early '96. That saves a lot of tracing problems.
In view of this tangle of financial transactions and Jesse's inability to make sense out of the disarray, we do not find the trial court abused its discretion in backing up to a date after the parties had separated and before most of the transference of assets commenced. In March of 1996, Jesse valued Blue Water at $330,000. That can be logically supported by the liquid assets Blue Water had received: at least $171,000 from the sale of the Bertram, $100,000 insurance for the fire relating to the Hatteras, and $55,000 from the sale of the Hatteras, which totaled $326,000, as well as other miscellaneous cash distributions from marital assets.
However, Pexin Farms is a different matter. Neither party offered any proof that entity had any value on the date of the parties' separation or thereafter. The court valued it at $211,000, which was slightly more than the total amount of the wire transfers the parties made to that entity over a two and one-half year period, from December 1990 to April 1993. Pexin is or was a pineapple farm located in Ghana, West Africa. Nelson Engineering contributed $50,000 to the total investment, and Jesse testified the $50,000 had been repaid to Nelson.
Jesse testified that Pexin has no current value other than some vehicles used by the business in Africa and that the land had been taken back. It was no longer operating and the financial statements executed by the parties in 1994 and 1997 did not mention Pexin. Betty offered no opinion as to Pexin's value in 1996.
From the evidence in this record it appears that Pexin Farms is a failed marital investment and that its loss of value had occurred prior to the time the parties separated. Imprudent investments do not constitute dissipation of marital assets,[6] and both parties must share the loss. Geddes v. Geddes, 530 So.2d 1011 (Fla. 4th DCA 1988). It is an abuse of discretion to value Pexin Farms at what the parties invested in it, and' then award it to one of the parties in the dissolution case at that value, when there is no evidence to support the current valuation. Gentile.
It appears that the court valued Pexin Farms at the parties' investment in that entity because it believed (based on the testimony of Jesse's secretary, Ms. Bucca), that there was a Swiss bank account used by Pexin, and that Jesse had diverted marital funds from the farm for his own purposes. The trial judge explained his ruling on this point:
I'm going to reject Mr. Nelson's testimony that the money was invested and totally lost. I think that is an implausible story. I think it is more likely that Mr. Nelson in some way kept the money. I am going to accept his secretary's testimony that there were records of a Swiss bank account....
Jesse denied that such a bank account existed, but Betty and his secretary testified to the contrary. Ms. Bucca testified she handled transfers of funds to and from Pexin Farms' Swiss bank account to Barclay's Bank, or visa versa. Checks were marked cash received for land sales. There was also evidence that Jesse had destroyed bank records, that he had records sent to his secretary's home rather than the business office, and that he had *984 been less than forthcoming regarding several discovery matters, including the existence of this Swiss bank account. This evidence might support a finding by the trial court that Jesse appropriated Betty's share of the marital assets invested in Pexin Farms; however, its finding on valuation as part of the equitable distribution cannot be sustained. On remand, the trial court may revisit this issue and assess him with her share.

C. A.G. Edwards Account, Government Bonds, and Ginnie Mae Bonds.
The trial court based its award to Jesse of government bonds ($58,000), the A.G. Edwards account ($113,000a net figure after subtracting a $182,000 loan against the account), and Ginnie Mae bonds ($125,000) on Jesse's financial statement dated March 14, 1996. The court chose not to base its valuation on the composite of account statements for A.G. Edwards for the period covering 1990 through 1997. The statement for February 23, 1996 showed the value of the account at $4,749, and the statement for December 25, 1995 showed it at $81,717. The court indicated it made its decision to value the assets as of March 14, 1996 based on the financial statement because it believed Jesse had withdrawn and pocketed most of those assets after the parties separated. We find no error here.
However, the court treated these items as separate entities. The government bonds and Ginnie Mae bonds were both part of the A.G. Edwards account. Based on the evidence at trial, the court found that Jesse had "reaped the benefit of the government bonds."[7] However, the Ginnie Mae bonds existed at the time of the March 14, 1996 financial statement and were in fact part of the A.G. Edwards account. Thus in awarding these assets and the total value of the account to Jesse, the court awarded the bonds twice to Jesse. He is thus entitled to a credit for $125,000.

II. ARE THE COMBINED EQUITABLE DISTRIBUTION AWARDS AND PERMANENT ALIMONY AWARD AN ABUSE OF THE TRIAL COURT'S DISCRETION.
Jesse argues that the total monthly monetary awards to Betty exceed his ability to pay, and that in view of her substantial asset holdings resulting from the equitable distribution award, she has no need for alimony. In its final judgment, the court awarded Betty permanent alimony of $1,000 per month, and in order to equalize the distribution of assets between the parties, it required Jesse to execute a promissory note in the face amount of $1,000,000 payable over a ten-year period, with interest at 7.75 percent. Thus Jesse must pay Betty (exclusive of other lesser amounts) $13,000 per month.
The court found generally that Jesse had the ability to pay the permanent alimony award and that Betty had a need for the alimony. The trial court's findings are sufficient to support these conclusions. The court found in favor of permanent alimony based on all of the classic reasons to award permanent alimony in a longterm marriage, including the parties' high standard of living and the disparity in their expected incomes after the dissolution. The trial court determined that Betty would receive in excess of $440,000 in interest over the ten years the note was payable, in connection with her equitable distribution.[8] He also concluded that Betty *985 could sell some of the real estate parcels, thereby investing those sums, and that some of the real estate could be rented, thereby deriving additional income for Betty.[9]
The court determined that Jesse would have a gross income of $150,000 from Nelson Engineering. This finding is supported by the expert witness testimony that a CEO of a company like Nelson should earn a salary of $150,000 to $200,000. If Jesse draws a salary of $150,000 per year, it is adequate to enable him to pay Betty's alimony of $1,000 per month.
There is also evidence in the record which supports the trial court's implicit conclusion that Jesse's total income is considerably more than his reasonable salary from Nelson Engineering, enabling him to meet the obligations of the promissory note. Both Jesse and Betty received salaries from Nelson, during the past few years of $110,000 per year, even though Betty no longer worked for the company, and the evidence established that the company was paying large amounts for the parties' personal expenses (car leases, insurance, credit card payments, travel expenses, mortgage and rent payments, etc.). Since Betty will no longer receive this income from Nelson Engineering because Jesse was awarded sole ownership of the company, he will enjoy this additional income. And Jesse's expert witness, Flavin, and Jesse himself, testified that Nelson Engineering had $200,000 to $300,000 per year net income before the payment of an executive's salary, and which could be distributed to stockholders.

III. REQUIREMENT THAT FORMER HUSBAND SECURE THE ALIMONY OBLIGATION WITH LIFE INSURANCE; REFUSAL OF THE TRIAL COURT TO ORDER THE FORMER HUSBAND TO PROVIDE THE FORMER WIFE WITH A PERFECTED SECURITY INTEREST IN THE STOCK OF NELSON ENGINEERING.
The trial court ordered Jesse to keep in force his Prudential Life Insurance Policy in the face amount of $150,000, and name Betty the irrevocable beneficiary, for the purpose of securing for her the alimony award. The judge also authorized Betty to obtain life insurance on Jesse's life, however the cost of this insurance to Betty was not determined.
The testimony at trial established that the parties originally had two life insurance policies, which were jointly owned, with joint survivorship provisions, totaling close to one million dollars. After the parties separated, Jesse cashed the policies in and obtained the Prudential Policy, and an additional policy, both insuring solely his life, with proceeds payable to his estate. The face value of the combined new policies total approximately one million dollars. He obtained from the exchange a cash benefit of $80,000, which he testified he loaned to Nelson Engineering. The balance went towards payment of the premiums for the first year on the new policies.
The Florida Supreme Court has sanctioned the use of life insurance policies to secure alimony under appropriate circumstances, Sobelman v. Sobelman, 541 So.2d 1153, 1155 (Fla.1989), although it did not spell out the kinds of circumstances or *986 equities which would make the award "appropriate." See O'Connor v. O'Connor, 782 So.2d 502 (Fla. 2d DCA 2001); Shimek v. Shimek, 532 So.2d 686 (Fla. 1st DCA 1988), approved, 545 So.2d 837 (Fla.1989); Fiveash v. Fiveash, 523 So.2d 764 (Fla. 1st DCA 1988). See also Kowalczyk v. Kowalczyk, 627 So.2d 591 (Fla. 2d DCA 1993) (Altenbernd, J., concurring specially).
Courts have found security by means of life insurance appropriate when the insurance is necessary to safeguard the receiving former spouse from being left in dire circumstances should the obligor former spouse predecease the obligee. See Sasnett v. Sasnett, 679 So.2d 1265, 1268-69 (Fla. 2d DCA 1996). Jesse argues that Betty will have an estate in excess of one million dollars and that his one million dollar promissory note to her is secured by his stock in Nelson Engineering. Therefore, should he predecease her there are no dire economic consequences for her to face.
The major asset awarded to her in the equitable distribution scheme is the promissory note for one million dollars, substantially in payment for her one-half interest in Nelson Engineering. Although the court also gave her a "lien" on 75% of the Nelson Engineering stock, it refused to order that the lien be perfected by placing the stock certificates in escrow, or by requiring that the certificates bear a legend disclosing Betty's lien.[10] This may have been in recognition of the fact that Nelson Engineering has credit lines with banks and needs to keep those relationships at the status quo to continue its successful operations.
In any event, should the note obligation not be paid, Betty would be in economic jeopardy. The court recognized this fact when it said at a hearing subsequent to the trial: "[I]f that equitable distribution scheme failed the alimony scheme has failed." Further, given the evidence at trial, the judge could also have been concerned about whether Betty will in fact receive payment of the promissory note and whether her lien will be honored. It tried to protect Betty by making the promissory note due on demand should payments be missed and also due should the company be sold. The court stated in the final judgment that should the note go into default, it would consider that a substantial change in circumstances had occurred and "revisit" the amount of alimony awarded to her.
If Jesse dies before Betty is paid her one-half interest in the company, she could find herself in greatly reduced financial circumstances and in need of additional income for support. In such a circumstance, she would have to pursue her claim as a creditor of Jesse's estate, with no assurance she will be a priority claimant or that she will have a priority or first claim against the company stock. Should the company continue to operate successfully, a suit to foreclose her lien on the company stock might disrupt the successful operation of the company. In any event, Betty's major source of income could be delayed or diminished. See Richardson v. Richardson, 722 So.2d 280 (Fla. 5th DCA 1998). The insurance serves to protect her financial well-being in this complicated equitable distribution scheme where the need for alimony and fulfillment of the equitable distribution award are inextricably intertwined. See generally, Sobelman.
We conclude the trial court did not abuse its discretion in requiring that the alimony award be secured by the insurance policy, in view of the equitable distribution scheme and the trial court's failure to secure the one million dollar promissory note payable to Betty with some kind of a *987 perfected security interest. On remand, the court should also take the requirement to pay insurance premiums on the policy into account in the determination of alimony and the overall ability of Jesse to pay the obligations resulting from this dissolution judgment. See Bogin v. Bogin, 780 So.2d 971 (Fla. 1st DCA 2001); Wrinkle v. Wrinkle, 592 So.2d 760 (Fla. 5th DCA 1992); Sobelman.

IV. ATTORNEY'S FEES.
Betty argues on cross-appeal that the trial court erred in not ordering Jesse to pay all of her attorney's fees. In the final judgment, the court awarded Betty's attorney $10,000 in fees because of the "extra efforts" required by Betty's attorney "as a result of Jesse being less than forthcoming in discovery." Jesse does not challenge this award on appeal.
However, Betty challenges the court's refusal to order Jesse to pay the additional $20,000 in attorney's fees Betty had incurred. The court reasoned that Betty had been able to pay the fees by receiving monies from Nelson Engineering, and also cited the fact that equitable distribution in this case resulted in her receiving one million dollars in assets, plus being owed an additional million. It found that the parties' financial situations relative to one another did not justify an additional attorney's fee award.
The trial judge did not abuse its discretion in denying Betty additional attorney's fees. See Freid v. Freid, 717 So.2d 145 (Fla. 5th DCA 1998); Rausch v. Rausch, 680 So.2d 624, 625 (Fla. 5th DCA 1996); Castillo v. Castillo, 626 So.2d 1035 (Fla. 3d DCA 1993).

V. SUMMARY.
Accordingly we affirm the trial court's judgment in this dissolution case except where it is in conflict with this opinion, and remand for recalculation of amounts involved in the equitable distribution scheme with regard to Pexin Farms, and the double assignment of the Ginnie Mae bonds to Jesse; and, for recalculation of Jesse's alimony obligation to include payment of the life insurance policy.
AFFIRMED in part; REVERSED in part; REMANDED.
PETERSON and GRIFFIN, JJ., concur.

ON MOTION TO REHEAR
SHARP, W., J.
We grant the motion to rehear and correct the first paragraph under section B on page 982 as follows:

B. Valuations of business Assets Distributed to Former Husband; Blue Water, Excel Tel Services, Pexin Farms.
The trial court opted to use March 14, 1996, to value the parties' assets, which was after the parties had separated but before the petition for dissolution was filed. Blue Water[1] and Excel Tel Services were valued on the Financial Statement at $330,000 and $300,000, respectively, as of March 14, 1996. The reason the trial court gave for selecting that date was twofold. First, neither party presented substantial competent evidence as to values close to that period of time, other than a financial statement executed by Jesse on that date. Neither party offered a better solution to the date of valuation of marital assets. In view of these facts, we cannot say the trial court abused its discretion in doing so.[2]
*988 We also correct footnote 4 in our earlier opinion to read:
Excel-Tel.Services, Inc., was a company solely owned by Betty, although it does not appear that she controlled it. The trial judge erroneously listed Jesse as the owner of this asset. There were two corporations with the name "Excel Tel": Excel Tel Services and Excel Tel Data Services. Excel Tel Data Services had no value, Excel Tel Services was valued at $300,000. The testimony regarding these corporations was confusing, and although Betty was the owner of Excel Tel Services, the record is unclear as to whether Jesse, Betty or Nelson Engineering received any value for it. On remand, the trial court should revisit this issue and make factual determinations thereon.
In all other respects, we affirm the opinion as written. [Editor's Note: Corrections incorporated for purposes of publication.]
PETERSON and GRIFFIN, JJ., concur.
NOTES
[1] The American Institute of Certified Public Accountants has identified several of the most popular approaches to business valuation in its 1987 management advisory services practice aid for CPAs. American Institute of Certified Public Accountants, Small Business Consulting Practice Aid No. 8, Valuation of a Closely Held Business 10 (1987). One is capitalization of excess earnings where the earnings in excess of a reasonable return on the tangible assets are divided by a factor to arrive at the value of the goodwill element which is added to the value of the tangible assets. The IRS relies heavily on this method to value a business for tax purposes. (Rev. Rul. 59-60, 1959-1 C.B. 237)
[2] Cummings v. Cummings, 719 So.2d 948 (Fla. 4th DCA 1998); Ellis v. Ellis, 699 So.2d 280 (Fla. 5th DCA 1997); Brock v. Brock, 690 So.2d 737 (Fla. 5th DCA 1997).
[3] Black's Law Dictionary defines goodwill as "the ability of a business to generate in excess of a normal rate on assets due to superior managerial skills, a market position, new product technology, etc." Justice Adkins defined the term in Swann v. Mitchell, 435 So.2d 797 (Fla.1983) as "the advantage or benefit the business has beyond the mere value of its property and capital." Goodwill is usually evidenced by general public patronage and is reflected in the increase in profits beyond those expected from the mere use of capital. 435 So.2d at 798.
[3] Blue Water owned, at one time, two boats: a Bertram and a Hatteras. The Bertram was sold and the Hatteras, which was insured, was destroyed by fire, refurbished and sold.
[4] Excel-Tel. Services, Inc., was a company solely owned by Betty, although it does not appear that she controlled it. The trial judge erroneously listed Jesse as the owner of this asset. There were two corporations with the name "Excel Tel": Excel Tel Services and Excel Tel Data Services. Excel Tel Data Services had no value, Excel Tel Services was valued at $300,000. The testimony regarding these corporations was confusing, and although Betty was the owner of Excel Tel Services, the record is unclear as to whether Jesse, Betty or Nelson Engineering received any value for it. On remand, the trial court should revisit this issue and make factual determinations thereon.
[5] § 61.075(6), Fla. Stat. See Reis v. Reis, 739 So.2d 704 (Fla. 3d DCA 1999); Noone v. Noone, 727 So.2d 972 (Fla. 5th DCA 1998).
[6] Gentile v. Gentile, 565 So.2d 820, 823 (Fla. 4th DCA 1990).
[7] Jesse testified he probably spent the funds on his boats, cash withdrawals and payment of credit cards.
[8] A spouse should not be required to spend principal to support herself. Brock v. Brock, 690 So.2d 737 (Fla. 5th DCA 1997); Benekos v. Benekos, 557 So.2d 942 (Fla. 2d DCA 1990).
[9] Betty also received the marital residence and a vacation home in which she had hoped to live.
[10] See § 679.115(a), Fla. Stat.
[1] Footnote 3, page 981 of the original opinion. Blue Water owned, at one time, two boats: a Bertram and a Hatteras. The Bertram was sold and the Hatteras, which was insured, was destroyed by fire, refurbished and sold.
[2] Footnote 5, page 982 of the original opinion. § 61.075(6), Fla. Stat. See Reis v. Reis, 739 So.2d 704(Fla. 3d DCA 1999); Noone v. Noone, 727 So.2d 972 (Fla. 5th DCA 1998).