**MIKHAIL, Plaintiff,**

v.

**MIKHAIL, Defendant.**

2003-Ohio-3089.]

Court of Common Pleas of Ohio,
Lucas County,
Domestic Relations Division.

No. DR 2001–0952.

Decided April 3, 2003.

Martin J. Holmes, for plaintiff.

Melvin G. Nusbaum and Henry B. Herschel, for defendant.

Norman G. Zemmelman, Judge.

{¶ 1} This cause was before the court on September 18 and 25, 2002 and November 20 and 22, 2002, upon the amended complaint for divorce and the answer and amended counterclaim for divorce. Each party was present, represented by his or her respective counsel. The parties testified in their own behalf, called witnesses, and introduced certain exhibits into evidence.

{¶ 2} The court finds that defendant, Wassef E. Michael Mikhail, was served with summons and a copy of the complaint as amended, which service is approved and that plaintiff, Salma A. Mikhail, was served with summons and a copy of the answer and amended counterclaim, which service is approved.

{¶ 3} The court further finds that each party had been a bona fide resident of the state of Ohio and Lucas County for more than six months immediately proceeding the filing of the complaint for divorce.

{¶ 4} The court further finds that the parties were married to each other on February 17, 1964, in Cairo, Egypt; that two children, Michael A. Mikhail and Miriam N. Mikhail, were born issue of the marriage; that both children are emancipated; and that the plaintiff is not pregnant.

{¶ 5} The court further finds that it has jurisdiction over each of the parties and the subject matter of this action.

{¶ 6} The court further finds that the parties have without interruption for more than one year lived separate and apart without cohabitation as set forth in R.C. 3105.01(J). Each party is entitled to an absolute decree of divorce from the other based upon living separate and apart in excess of one year without cohabitation.

{¶ 7} The court further finds that the parties entered into the following stipulations:

"1.   The personal property consisting of household furniture, furnishings, china, ornaments, crystal, art, jewelry, carpets, automobiles, and rugs will be divided pursuant to the following documents: Defendant's attorney's May 22, 2002 letter to Plaintiff's attorney; Plaintiff's attorney's May 28, 2002 response with list of jewelry attached; Defendant's attorney's June 24, 2002 five (5) page letter to Plaintiff's attorney; Plaintiff's attorney's June 26, 2002 four (4) page response; Defendant's attorney's August 22, 2002 three (3) page reply; Plaintiff's attorney's September 3, 2002 reply with options for Defendant regarding rugs; Defendant chose option B listed on page two (2); Defendant will pay for the shipment of three (3) Persian rugs from Sanibel, Florida to Plaintiff's residence in Toledo; and

"2.   The parties further entered into an agreement on September 17, 2002 that: 1. One month after the filing of the Court's Decision, 4203 Shamley Green Rd. will be listed for sale for Two Hundred Fifty Thousand Dollars ($250,-000.00) by realtor, Ellen Robertson: a) Plaintiff will have thirty (30) days to vacate with her personal property; then Defendant will make arrangements to remove his personal property from Shamley Green Rd.; b) Plaintiff has a duty to maintain Defendant's property; each has the right to have a preapproved inspector to inspect the property; c) after expenses of sale, the net proceeds to

be divided equally—if the property is not sold by May 1, 2004; the Court reserves jurisdiction to set another sale price. d) Plaintiff shall be responsible for the mortgage, taxes, utilities, and insurance during occupancy. 2. The two (2) Palm Coast lots will be listed for sale; the net proceeds to be divided equally. 3. The E36 Point Santo, Sanibel Island condominium is to be listed for sale with realtor, David Schentenfry at the price of One Million Two Hundred Thousand Dollars ($1,200,000.00), including contents; after expenses of sale, the net proceeds to be divided equally; a) during pendency of sale, net proceeds from rental sent by VIP Realty to be divided equally; b) if the property is not sold by May 1, 2004 the Court reserves jurisdiction to set another sale price. 4. The checks held by Defendant's attorney in the amount of Thirty–One Thousand Nine Hundred Forty–Seven Dollars and Twenty–Eight Cents ($31,947.28) shall be divided equally; the check for Three Thousand Seven Hundred Ninety–Four Dollars and Sixty–One Cents ($3,794.61) held by Plaintiff's attorney shall be divided equally. 5. The Defendant's royalty income from existing patents' licensing agreements: a) net income, after federal/state taxes, will be equally divided, beginning December 31, 2003 and payable to Plaintiff on December 31st of each year thereafter, so long as there is income; b) Defendant shall furnish Plaintiff with copies of all Form 1099s received from any royalties or income generated from patents or licensing agreements, and an accounting of expenses that are directly related, including necessary accounting and attorney fees paid through that particular year attributable to the royalties and income including, any necessary and reasonable attorney fees concerning patent defenses, any fees necessary for patent renewals on existing patents and, any patent fees for existing patents—the term "expenses that are directly related" does not include deductions from gross revenue for payments to other doctors, firms or companies; c) there will be an accounting for federal/state taxes paid. 6. The parties will file joint tax returns for 2002 and 2001: a) any tax liability will be paid from joint assets; any net refund to be split equally. 7. Capital gains taxes upon the sale of real estate properties, E36 Point Santo, Sanibel condominium, the two (2) Palm Coast lots, and 4203 Shamley Green Rd.: a) each party shall be responsible for one-half (½) of any taxes due and owing by IRS or State of Ohio; any net refunds will be split equally. 8. 536 Lighthouse, Sanibel, FL will be awarded to the Defendant subject to Plaintiff's equity interest: a) Defendant to be responsible for mortgage, taxes, utilities and insurance."

{¶ 8} The court finds the foregoing stipulations to be fair and reasonable and are hereby adopted by the court.

{¶ 9} The parties have submitted the following issues to the court for determination:

1. Whether Defendant committed financial misconduct;  and

2. The division of the marital assets and liabilities;  and

3. Plaintiff's entitlement to an award of spousal support;  and

4. Plaintiff's entitlement to an award of attorney's fees.

## VALUATION DATE

{¶ 10} The term "during the marriage" is statutorily presumed to run from the date of the marriage through the date of the final divorce hearing. R.C. 3105.171(A)(2)(a). However, if the court determines that the use of either or both of these dates would be inequitable, the court may select dates that it considers equitable in determining the value of marital property. R.C. 3105.171(A)(2)(b).

{¶ 11} The court finds that the term "during the marriage" shall be from the date of the marriage through the date of the divorce hearing. This finding is based upon the fact that the parties did not physically separate until March 2001; that there has never been a financial separation between them; that the parties will file joint income tax returns for the years 2001 and 2002; and the bulk of the marital assets is stocks contained in several investment accounts that were adversely impacted by post-September 11, 2001 events. Accordingly, for purposes of valuation of the marital assets, the court will use the date of marriage of the parties through September 2002, or the closest available date thereto, unless otherwise indicated based upon the evidence and equitable considerations.

## DEFENDANT'S ALLEGED FINANCIAL MISCONDUCT

{¶ 12} Plaintiff claims that defendant has committed several acts of financial misconduct. These acts are alleged to be defendant's investment practices of buying stocks and not diversifying the investments, using a margin account to finance such stock purchases, making monetary gifts to the children of the parties, making a gift of stock to a friend's child, and making gifts to defendant's former secretary/office manager. The plaintiff alleges that these acts were done without plaintiff's knowledge or consent and against her wishes and advice. The plaintiff further alleges that the defendant failed to account for cash expenditures of approximately $250,000 over a seven-year period between 1994 and 2001.

{¶ 13} Plaintiff argues that a fiduciary relationship exists between spouses. Based upon that relationship, a "prudent man" standard applies to financial dealings. Any breach of that duty, plaintiff contends, results in liability for all losses. On this basis, plaintiff asserts that liability is established regardless of defendant's intention(s) or whether he gained financially from his conduct. As a

result of defendant's financial misconduct as alleged, the plaintiff claims entitlement to a distributive award of a greater than equal share of the marital assets.[1]

{¶ 14} R.C. 3105.171(E)(3) provides, "[i]f a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property."

{¶ 15} Interpreting this statutory language, the court in *Detlef v. Detlef* (Dec. 14, 2001), Lucas App. No. L–00–1137, at 13–14, 2001 WL 1590095, stated:

> "The financial misconduct statute should apply only if the spouse engaged in some type of wrongdoing. *Jump v. Jump* (Nov. 30, 2000), Lucas App. No. L–00–1040, unreported [2000 WL 1752691], citing *Hammond v. Brown* (Sept. 14, 1995), Cuyahoga App. No. 67268, unreported [1995 WL 546903]. Typically, the offending spouse will either profit from the misconduct or intentionally defeat the other spouse's distribution of marital assets.' *Hammond, supra.*
>
> "The time frame in which the alleged misconduct occurs may often demonstrate wrongful scienter, i.e., the use of marital assets or funds during the pendency of or immediately prior to filing for divorce. * * * An allegation of financial misconduct, unsupported by evidence of wrongdoing, will not support a dissipation award. *Rinehart v. Rinehart* (May 18, 1998), Gallia App. No. 96 CA 10, unreported [1998 WL 282622]." See also *Dickinson v. Dickinson* (Nov. 30, 2001), Wood App. No. WD–01–015 [2001 WL 1518044].

{¶ 16} The holding in *Detlef* reflects that of *Hammond v. Brown* (Sept. 14, 1985), Cuyahoga App. No. 67268, at 3–4, 1995 WL 546903, where the court stated:

> "An implicit element of financial misconduct is wrongdoing. Thus, while R.C. 3105.171(E)(3) does not set forth an exclusive listing of acts constituting financial misconduct, those acts that are listed (dissipation, destruction, concealment, or fraudulent disposition) all contain some element requiring wrongful scienter. Typically, the offending spouse will either profit from the misconduct or intentionally defeat the other spouse's distribution of marital assets.
>
> "Because financial misconduct involves some element of profit or interference with another's property rights, the time frame in which the alleged misconduct occurs may often demonstrate wrongful scienter. For example, diminution of the marital estate during the pendency of a divorce action might create an

---

1. While the court was impressed by plaintiff's expert economist, Dr. Harvey Rosen, his testimony was based upon the application of a prudent investor standard. That standard, however, is found not to be applicable to the defendant, who is not a stock broker or investment counselor, or to the plaintiff, who is not a client of the defendant. Rather, the proper standard is whether the defendant's acts and/or omissions constitute financial misconduct within the meaning of R.C. 3105.171(E)(3).

inference of misconduct. * * * In addition, actions diminishing marital assets at the time of the parties' permanent separation could be considered misconduct." (Citations omitted.) Id.

{¶ 17} The parties separated in March 2001; the complaint for divorce was filed in July 2001. The several acts of defendant that plaintiff characterizes as financial misconduct all occurred, or began prior to those dates, at times when the parties were cohabitating as spouses: defendant's investment strategy of purchasing stocks had been ongoing for a period in excess of twenty years; the defendant had an established practice of buying stocks on margin since 1997; the children's accounts had been in place for many years; the gift of stock to the friend's son occurred in June 1999; the gifts made to the defendant's former secretary/office manager spanned a period of eleven years ending in 2000; and the alleged unaccountable cash expenditures covered a period from 1994 through 2001.

{¶ 18} Accordingly, the undisputed evidence showed that the financial activities of the defendant, which the plaintiff claims to constitute financial misconduct, occurred prior to the separation of the parties in 2001. Thus, the plaintiff is not entitled to a presumption of wrongful scienter. The court finds that the plaintiff has failed to prove that the defendant's conduct was intended to dissipate the plaintiff's share of the marital estate. The court further finds that the defendant did not personally gain or profit from any of the alleged misconduct. The court further finds that there was nothing evasive about the defendant's financial dealings—each transaction was properly documented thereby avoiding any question or confusion.

{¶ 19} The plaintiff characterizes defendant's investment practice as "speculation." Yet the undisputed testimony showed that the defendant invested in growth companies involved in technology: computers, semiconductors, telecommunications, and biotechnology. The defendant was not an investor acting upon a "tip" or dealing in "penny stocks." He did his own research and made the stock purchases after consultation with his investment advisors. The stocks were purchased at a price that the defendant determined would be at an appropriate level to make the acquisition. These practices could hardly be described as being speculative.

{¶ 20} The plaintiff characterizes the defendant's practice of buying stock "on margin" as being "reckless."[2] The undisputed evidence showed that after the

---

2. {¶ a} The several tax returns introduced by the plaintiff from the years 1997 through 2001 show investment interest paid totaling $645,765, for an average of $129,153 per year, all of which was tax deductible. These same tax returns show capital gains income totaling $4,991,654, an average of $998,331 per year.

severe market correction/crash following the events of September 11, 2001, the defendant still remained on the positive side of the investment ledger in the amount of several million dollars. Indeed, both professional investment advisors testified that the defendant made correct investment choices over the years.

{¶ 21} The plaintiff places great emphasis on a meeting in December 1999, between the parties and Richard Flasck, their investment advisor/broker at Merrill Lynch.[3] At that meeting, Flasck recommended that the defendant consider diversifying several portfolios to include income generating assets such as certificates of deposit and municipal bonds. At best, the plaintiff may have encouraged the defendant to follow Flasck's investment strategy. At no time did the plaintiff ever insist that the defendant diversify his stock portfolio. Indeed, in December 1999, plaintiff held two investment accounts in her own name. Although she had full authority over those accounts, she did not act upon Flasck's recommendation. It was not until October 2001, following the separation of the parties and after defendant had transferred $4,000,000 in stocks into one of plaintiff's accounts, that she diversified her portfolio.

{¶ 22} In *Hoyt v. Hoyt* (1990), 53 Ohio St.3d 177, 559 N.E.2d 1292, the court referred to the marital relationship as one of economic partnership. In this relationship, one partner's utilization of an investment strategy that turns out to be imprudent under the circumstances does not constitute a dissipation of marital assets. In *Geddes v. Geddes* (Fla. 4th DCA 1988), 530 So.2d 1011, the court stated that "those entering into a marriage partnership must share not only the benefits and successes of the relationship, but also the risk of failure and the economic consequences to the parties of such failure." Similarly, in *Gentile v. Gentile* (Fla. 4th DCA 1990), 565 So.2d 820, the court stated:

"To allow the parties to litigate whether one spouse invested the parties' money contrary to a 'prudent man' standard entitling the other spouse to a greater share of the marital pie and economic devastation for the other spouse raises the consideration of 'marital misconduct' to new and unchartered levels of fault finding. The next step of course would be to insist on a financial accounting of all the marital years to determine which spouse was the more prudent investor and spender. We do not choose to start down such a path with this case."

{¶ 23} Based upon the foregoing, the court finds that the plaintiff failed to establish that the defendant engaged in acts of financial misconduct. The

---

{¶ b} The court notes that the parties utilized defendant's margin account to partially finance the purchase of the Sanibel residence by taking a loan for $1,800,000 in May 2000. Therefore, the balance of that margin account includes the unpaid portion of that indebtedness.

3. Flasck described the meeting as one he had with the defendant, although the plaintiff was invited and did "come and go during the meeting."

financial activities that the plaintiff complains about cannot be characterized as attempting to dissipate, destroy, conceal, or fraudulently dispose of any marital assets within the meaning of R.C. 3105.171(E)(3).

## MARITAL ASSETS AND LIABILITIES

{¶ 24} Domestic relations courts are required by law to divide marital property equitably between the spouses. R.C. 3105.171(B). This requires, in most instances, that marital property be divided equally. R.C. 3105.171(C)(1). However, if an equal division would produce an inequitable result, then the marital property must be divided in such a way as the court determines to be equitable. Id.

## ASSETS FOUND TO BE NONMARITAL

### The Children's Trusts and Merrill Lynch Accounts

{¶ 25} Plaintiff asserts that marital funds were used to establish and fund the children's trusts and brokerage accounts, and, on this basis, these trusts and accounts are marital assets.

{¶ 26} Each of the parties' two children, Michael A. Mikhail and Miriam N. Mikhail, has a trust account and a Merrill Lynch cash management account titled in their own name. These trust accounts were established in 1978. The evidence showed that the parties established and funded the trusts and the accounts; that the parties made significant monetary gifts in recognition of special occasions to their children; that the children also made contributions into their accounts from monetary gifts and wage earnings; and that the defendant had previously managed the children's accounts as their custodian.

{¶ 27} It is undisputed that the terms of the trusts provided that each child would receive the entire balance upon reaching a specified age and that the children have received possession of their trusts. It is also undisputed that the children have moved their brokerage accounts to their current residences in Minnesota and Florida.

{¶ 28} Based upon the foregoing, the court finds that the children's trusts and brokerage accounts are to be excluded from the marital estate. The court finds that during the marriage, the parties agreed to maintain funds for the purpose of financially providing for their children. Such gifting practices converted what began as marital assets into nonmarital assets.

### The Defendant's Foundation Trust

{¶ 29} Plaintiff asserted that she is entitled to 50 percent of the funds held in the Foundation Trust as the defendant used marital assets to fund the

foundation. Defendant testified that the foundation was established for a tax benefit as contributions are tax deductible. The parties served as the two trustees for the foundation until plaintiff resigned her trusteeship in April 2001.

{¶ 30} Frank Jacobs, Esq., testified that he organized an "irrevocable" trust for defendant's foundation in 1985; that the foundation is an Internal Revenue Code Section 503(c)-approved nonprofit charitable foundation in which contributions are tax deductible. Jacobs further testified that the foundation's sole purpose is to receive funds to be spent for charitable benefits. He emphasized that no money would be received by the defendant/donor because the foundation is an "irrevocable" trust; that if the foundation is closed, the money would go to charity; that if the defendant dissolved the foundation, the money remaining in the trust could not be split between the parties, nor could the money be returned to the defendant.

{¶ 31} Based upon the foregoing, the court finds that the defendant's Foundation Trust is to be excluded from the marital estate. The court finds that the parties agreed to establish an irrevocable trust for the exclusive benefit of their charitable endeavors during the marriage, thereby converting what had been a marital asset into a non-marital asset.

## MARITAL ASSETS

### Marital Residence Located in Sanibel, FL

{¶ 32} Each party retained an expert to value the property. Both experts did an on-site inspection and a comparable sales analysis in December 2001. Defendant's expert, Robert S. Donovan, a certified residential real estate appraiser and licensed real estate salesman, testified to a value of $3,000,000. Plaintiff's expert, Dale A. Robertson, a certified residential real estate appraiser and licensed real estate salesman, testified[4] to a value of $3,100,000.

{¶ 33} Robertson has more experience as an appraiser of residential properties. Since 1987, Robertson's appraisals have almost exclusively been performed on Sanibel and Captiva, averaging 300 to 500 appraisals per year; he has performed 4,500 appraisals in the last 10 years of which 98 percent were properties on Sanibel and Captiva; he has testified in court, including Lee County Circuit Court in which Sanibel is located, and in depositions. In contrast, Donovan has 4 years of experience as an appraiser of residential properties. He testified that he performed 6 to 12 appraisals per year on Sanibel/Captiva, or 20 appraisals per year, 50 percent on Sanibel and 50 percent on Captiva, which included condominiums.

---

4. Plaintiff's expert, Robertson, testified by deposition.

{¶ 34} As for their respective appraisals, both appraisers searched for comparable sales listing 5 sales of which 3 comparable sales were identical. Robertson's comparable sales included a residence located on Captiva, while Donovan's were all located on Sanibel. Both appraisers testified as to the actual age versus the effective age of the property, lot size, site, value, gross living area, the cost value to purchase the site and reproduce construction of the residence, as well as the market value for the real estate.

{¶ 35} The major differences between the 2 appraisals are the determination of the lot size, the site value, and the gross living area ("GLA") comprised of the first and second levels. Donovan found the lot size to be larger by 330 square feet; Robertson's value for the site was $150,000 greater that Donovan's site value. There is a 322 square foot difference in the GLA between the 2 appraisals. Neither appraisal included the ground level or the garage in the GLA calculations.

{¶ 36} Robertson testified that the ground level did not meet zoning regulations because the property is located in a flood zone, and, therefore, not included in the GLA. He further testified that he was familiar with this particular property as the recent appraisal was the third time that he came onto the property. He initially inspected the property at the time the residence was constructed in 1996. In 2000, Robertson was requested to appraise the property but performed only a inspection/walk through because the appraisal assignment was canceled. He further testified that the property was sold to the parties for $2,800,000 in May 2000. Robertson testified that although he did not recall the appraised value in 1996, the value would have been lower than his current appraisal because the addition of the dinette area on the rear of the first level was constructed after the parties purchased the property.

{¶ 37} On balance, the court was persuaded more by Robertson's testimony than that of Donovan. Robertson had considerably greater experience and had appraised this particular property on prior occasions. Accordingly, the court finds the value of the Florida residence to be $3,100,000 as of December 2001. The property is encumbered by an outstanding mortgage balance of $984,658 as of September 2002. Accordingly, the court finds an equity interest in the marital residence of $2,145,342.

{¶ 38} Defendant shall be awarded the Sanibel residence subject to all encumbrances. At the time of the filing of the judgment entry of divorce, plaintiff shall execute a quit-claim deed in favor of the defendant divesting herself of all interest in this property. Defendant shall be solely responsible for the existing home mortgage, taxes, ongoing maintenance, insurance, and hold the plaintiff harmless therefrom. Within 90 days of the filing of the judgment entry of divorce,

defendant shall take such steps that are necessary to remove plaintiff from any responsibility on the existing mortgage.

## Retirement Accounts

{¶ 39} Plaintiff's Merrill Lynch IRA account has a net value of $28,037 as of August 30, 2002.[5]

{¶ 40} Defendant's Merrill Lynch IRRA account has a net value of $3,907,702 as of July 31, 2002.[6]

{¶ 41} Defendant's Fifth Third Bank 401(k) Associated Physicians of Medical College of Ohio account has a net value of $17,376 as of June 30, 2002.

{¶ 42} Defendant's STRS account has a present value of $189,994 as of September 19, 2002.

## Investment Accounts

{¶ 43} Plaintiff's Merrill Lynch Trust/CMA account has a net value of $3,625,008 as of July 31, 2002.[7]

{¶ 44} Defendant's Merrill Lynch Trust/CMA account has a net value of $10,041,751 as of July 31, 2002.[8]

{¶ 45} Defendant's Merrill Lynch business account has a net value of $25,171 as of June 28, 2002.

{¶ 46} Defendant's UBS PaineWebber Trust account[9] has a net portfolio value of zero as of July 31, 2002.

---

5. The IRA of the plaintiff and the IRRA of the defendant are valued as of August 30, 2002 and July 31, 2002, respectively. The only monthly statement to value the IRRA was that of July 31, 2002. Exhibit 101. Therefore, the statement closest to that date was used to value the Plaintiff's IRA. Exhibit 285.

6. See footnote 5.

7. The date of July 31, 2002, is used to value each party's trust account at Merrill Lynch as that is the only common date for which the court has monthly statements from Merrill Lynch. Compare Exhibits 264, 265, UUU and TTT with 78.

8. See footnote 7.

9. Defendant's stockbroker, Joseph Majdalani of UBS PaineWebber, testified that as of January 2002, the defendant's portfolio at PaineWebber had one share unit of ICOS Clinical Partners, LP valued at $100,000 with a cost basis of $95,000, 20,000 units of "Censtor Corp. Ser B Conv Pfd" valued at $2.50 per share, as well as the restricted securities that had no value. Exhibit 245, a UPW account statement for Defendant's Revocable Trust shows the portfolio summary value as of July 31, 2002 of ".00" for 8,000 shares of ICOS Restricted Warrants, 20,000 units of "Censtor Corp. Ser B Conv Pfd," and one unit of ICOS Clinical Partners, LP.

{¶ 47} Each party has a debit balance associated with their respective revocable trust accounts at Merrill Lynch. The plaintiff has a debit balance of $2,831; the defendant has a debit balance of $2,015,842. The court valued the parties' respective trusts using the net portfolio value, which takes the debit balance into consideration in the calculation. Each party shall be solely responsible for any debit balance or deficiency in their securities account(s) and hold the other party harmless.

### Partnership and S–Corporate Interests

{¶ 48} The parties' accountant, Kevin Gilmore, CPA, testified that the defendant had 14 business entities in place as of 1994, the year he became the defendant's accountant. These entities were in the form of partnership and S–Corporation interests. The defendant reported income from these business entities in 2001 totaling $200,517. Gilmore further testified that there would be no tax consequences for transfers of limited partnerships pursuant to a property settlement in a divorce.

{¶ 49} Defendant testified that these business entities were not valued and that a secondary market exists for the sale in these interests. Defendant further testified that he redeemed ownership interests in one of the partnerships, PaineWebber Technology Partners, L.P. in 2001 from which he received approximately $266,056 in 2002. These funds were deposited into his UPW Trust account and subsequently transferred to his Merrill Lynch Trust account. Seven of the remaining 13 business entities[10] are held in either the defendant's UBS PaineWebber ("UPW") personal account, his UPW Trust account, or his Merrill Lynch Trust account.

{¶ 50} The court finds that the defendant's interests in the 13 business entities in the form of partnerships and S Corporate interests shall be equally divided.

### Financial Accounts

{¶ 51} Defendant's Fifth Third Bank checking account is valued at $109,271 as of October 11, 2002.

---

10.

| | |
|---|---|
| Alkermes Clinical Partners | JMB/Manhatten Assoc., LTD |
| Capital Housing Partners | Oxford Residential Properties, LP |
| Cephalon Clinical Partners, LP | Peppermill Village—Oxford Assoc. |
| Don Carter All Star Lanes | Paine Webber R & D Partners III, LP |
| Hamilton Associates | Spectra Group Limited, Inc. |
| ICOS Clinical Partners, LP | Suntree Oxford Associates |
| JMB/245 Park Avenue Assoc., LTD | |

{¶ 52} Defendant's Barclay Bank, England account is valued at $2,100 as of September 18, 2002.

### Foreign Currency

{¶ 53} Defendant testified that he has foreign currency valued at $5,400 in his possession as of September 25, 2002.

### Cash

{¶ 54} Defendant testified that as of September 25, 2002, he held cash with a total value of $7,200.

### Unendorsed Checks

{¶ 55} There are 11 checks issued to the parties in October and November 2000, totaling $7,433. Each party claims that the other party is in possession of the checks. Plaintiff asserts that she gave the checks to the defendant upon their discovery and that she never received any of the monies from the checks. The defendant claims that he never received the checks. The court finds that defendant shall be responsible for the checks that should be reissued, if possible.

### Personal Property

{¶ 56} The personal property consisting of household furniture, furnishings, china, ornaments, crystal, art, jewelry, carpets, 3 automobiles and rugs have been divided by agreement of the parties.

{¶ 57} At issue is the smaller of 3 Persian rugs received by plaintiff from defendant. Plaintiff asserts that defendant "switched rugs" on her, and, therefore, she did not receive the acceptable rug allocated to her. Defendant denies that the rugs were switched. The court finds that plaintiff failed to prove that defendant sent a substituted rug from his Sanibel residence to plaintiff's Toledo residence.

## DIVISION OF THE MARITAL ESTATE

{¶ 58} In *Loeffler v. Loeffler* (Nov. 20, 1998), Lucas App. No. L–97–1271, 1998 WL 800951, court sets forth the standard for dividing the marital estate: "A trial court is vested with broad discretion when fashioning its division of marital property. *Bisker v. Bisker* (1994), 69 Ohio St.3d 608, 609, 635 N.E.2d 308. *In the usual case, the law requires that the marital property be divided equally. See R.C. 3105.171(C)(1). If, however, an equal division would produce an inequitable result, the property of the parties must be divided in such a way as the domestic relations court determines to be equitable. R.C. 3105.171(D); Baker v. Baker* (1992), 83 Ohio App.3d 700, 702, 615 N.E.2d 699;

*King v. King* (1992), 78 Ohio App.3d 599, 604, 605 N.E.2d 970. In making a division of marital property or a distributive award, the trial court is required to consider all nine factors listed in R.C. 3105.171(F) and make written findings of fact to support its determination, see R.C. 3105.171(G)." (Footnote omitted and emphasis added.)

{¶ 59} The court makes the following distribution of the marital property:

| | | Plaintiff | Defendant |
|---|---|---|---|
| | 536 Lighthouse Way, Sanibel, FL.<br>- equity $2,145,342 | | $2,145,342 |
| **Retirement Accounts** | *Plaintiff's*:<br>ML IRA acct.<br>- as of 08/30/02: $28,037 | $ 28,037 | |
| | *Defendant's*:<br>ML IRRA acct.<br>- as of 07/31/02: $3,907,702 | | 3,907,702 |
| | *Defendant's*:<br>Fifth Third Bank 401(k) APMCO acct.<br>- as of 06/30/02: $17,376 | | 17,376 |
| | *Defendant's*:<br>STRS acct. as of 09/19/02: $189,994 | | 189,994 |
| **Brokerage Accounts** | *Merrill Lynch*<br>Plaintiff's Trust/CMA acct.<br>- as of 07/31/02: $3,625,008 | 3,625,008 | |
| | *Merrill Lynch*<br>Defendant's Trust/CMA acct.<br>- as of 07/31/02: $10,041,751 | | 10,041,751 |
| | *Merrill Lynch*<br>Defendant's business acct.<br>- as of 06/28/02: $25,171 | | 25,171 |
| | *UBS PaineWebber*<br>Defendant's Trust acct. as of 07/31/02:<br>zero | | 0 |
| **Financial Accounts** | Defendant's Fifth Third Bank checking acct.<br>- stipulated value as of 10/11/02:<br>$109,271 | | 109,271 |
| | Defendant's Barclay Bank, England acct.<br>- as of 09/18/02: $2,100 | | 2,100 |
| | Foreign Currency In Defendant's Possession<br>- as of 09/25/02: $5,400 | | 5,400 |
| | Cash In Defendant's Possession<br>- as of 09/25/02: $7,200 | | 7,200 |

Eleven Unendorsed Checks:  $7,433                                              7,433

{¶ 60} Each party will receive one-half of the nonappraised personal property, one-half interest in each of the 13 nonappraised business entities,[11] one-half the future net proceeds from sales of the parties' real estate consisting of the former marital residence in Toledo, Ohio, the condominium in Sanibel, Florida, the 2 lots in Palm Coast, Florida, and one-half of the future annual net royalty income.

{¶ 61} Except as otherwise provided, each party shall be entitled to the full interest in the marital property awarded them free and clear of any interest of the other.  Each party shall execute such deeds or other documents that are necessary to convey full interest to the party receiving the asset.  In the event that either party fails to execute the required document, a copy of this decision and the judgment entry of divorce will serve as a conveyance of the interest of the respective parties.

{¶ 62} The court finds the value of the marital assets awarded the plaintiff to be $3,653,045.  The court further finds the value of marital assets awarded the defendant to be $16,458,740.  Equalization of the marital estate would require that plaintiff receive a distributive award of $6,402,848.

{¶ 63} Accordingly, the court finds that the defendant shall transfer one-half of the value in securities in his Merrill Lynch Trust account into the plaintiff's Merrill Lynch Trust account and further transfer the amount of $1,381,973 in securities from his Merrill Lynch IRRA account to the plaintiff's Merrill Lynch IRA account.  These transfers shall be made within 10 days of the filing of this decision.  The defendant may determine which securities shall be transferred from each account.  However, those stocks transferred shall have relative equal rates of appreciation so that a hypothetical sale of those stocks transferred to the plaintiff and those retained by the defendant would have, as near as possible, an equal gross capital gains tax liability.

{¶ 64} Upon consideration of the statutory factors listed in R.C. 3105.171(F), the court finds that an equal distribution of the marital estate would be equitable based upon the long duration of the marriage, the ages of the parties, the value and nature of the assets being divided, the liquidation of the securities in the investment and retirement accounts would have attendant costs and incur capital gains tax liabilities, there are no adverse tax consequences involved with the transfer of investment assets between defendant's trust account and plaintiff's trust account, or for transfers of business-ownership interests, the relative

---

11.  Defendant shall effectuate a transfer of a 50 percent interest in each of the 13 business entities to plaintiff within 30 days of the filing of this decision.

liquidity of the property awarded to each party, and there is no further financial entanglement between the parties.

## SPOUSAL SUPPORT

{¶ 65} An award of spousal support serves to provide a spouse with both sustenance and support, R.C. 3105.18(B) and (C)(1), and is governed by standards of reasonableness and appropriateness. R.C. 3105.18(C)(1). In determining whether spousal support is appropriate and reasonable and in deciding the nature, amount, duration, and terms of payment, a trial court is directed to consider all relevant factors. R.C. 3105.18(C)(1). Any amount of spousal support awarded should provide for a termination point within a reasonable time period except in marriages of long duration, parties of advanced age, or a homemaker spouse with little opportunity to develop meaningful employment outside of the home. *Kunkle v. Kunkle* (1990), 51 Ohio St.3d 64, 554 N.E.2d 83, paragraph one of the syllabus.

{¶ 66} The court has considered all statutory factors and finds that an award of spousal support would be appropriate and reasonable based upon the following:

{¶ 67} The parties had been married for almost 4 decades; it is apparent that their standard of living during the marriage was within the means of an "upper class" standard commensurable with defendant's substantial income; the parties made charitable contributions and gifts to friends and associates during the marriage; the parties' recurrent international travels were primarily related to promotions of orthopedic products on behalf of the manufacturers that had licensing agreements for defendant's patents; they enjoyed a comfortable life-style that included global travels, family vacations, second residences in Florida, and country club memberships.

{¶ 68} Each party has been awarded in excess of $10,000,000 of marital assets, many of which are income generating. The defendant's royalty income from the several existing patents' licensing agreements are to be equally divided beginning December 2003, payable December 2004. The only liabilities are the mortgage on the residence on Sanibel awarded to the defendant and the margin accounts on the Merrill Lynch trust accounts in the name of each party.

{¶ 69} The parties' retirement benefits total in excess of $4,000,000. The plaintiff has been awarded $1,410,008 of retirement benefits; the defendant has been awarded the balance of the retirement funds totaling approximately $2,733,101. Each party will incur tax consequences upon withdrawal of the retirement funds.

{¶ 70} Plaintiff is 64 years old and underwent a heart catheterization in April 2001; she was awarded a doctorate degree in English literature criticism from the University of Cairo, Egypt, in June 1963, and also earned a bachelor of arts degree in art history from the University of Toledo in 1983. After consultation with their accountant (who characterized plaintiff's potential wages as a "hobby" that would adversely impact defendant's tax rate), the parties agreed that plaintiff would not undertake outside employment. Accordingly, plaintiff's primary responsibilities during the marriage were for the care of the parties' children and her husband, and the maintenance of their home. She assisted her husband's career by typing and proofing documents, by overseeing accommodations and finances for the physicians selected for surgical fellowships, and accompanying defendant on promotional trips paid by the corporations holding licensing agreements for defendant's patents. Although plaintiff held several teaching positions and worked intermittently in defendant's medical office during the course of the marriage, she lacks the 40 credits required to qualify for Social Security retirement or disability benefits and Medicare benefits. As a former spouse, plaintiff will be eligible for Social Security benefits by virtue of defendant's retirement.[12]

{¶ 71} Defendant is 67 years old; he received a medical degree from the Cairo University School of Medicine, Egypt, prior to marriage; defendant has ownership and management of numerous patents generating substantial annual royalty income. Defendant was self-employed in orthopedic practice (Regency Orthopedics Specialists, Inc.) prior to his appointment as Director of the Division of Total Joints, Department of Orthopedics of the Medical College of Ohio and Associated Physicians, ("MCO/APMCO") in 1998.

{¶ 72} Defendant described his health as "fair"; he has had major heart problems since November 1996, 3 of 4 stents have failed necessitating triple bypass surgery in April 1997; he was able to work 3 months in 1997; he subsequently underwent 2 cardiac angioplasties; he takes prescribed medications for a heart condition; he is a borderline diabetic. Defendant took a 6–month sick leave from MCO/APMCO in 2001 prior to his resignation and retirement for health reasons that same year.

{¶ 73} Defendant holds the McMaster/Gardner endowed chair of Orthopedic Biomedical Engineering at the Department of Bioengineering, College of Engineering, University of Toledo as of August 2000. The research professorship is effective until defendant resigns; the position pays an annual salary of $50,000;

---

12. Defendant received $14,580 in Social Security retirement benefits in 2001. Plaintiff elected to receive her derivative retirement benefit of $701 monthly upon reaching age 65, at which time she will be entitled to Medicare benefits.

the accountant testified that defendant would net $35,000 annually from this appointment. Defendant is required to teach and supervise up to 6 students in the bioengineering graduate program; currently no students have been recruited into the program.

{¶ 74} Since 1969, plaintiff had wage earnings for 15 years ranging from a maximum of $5,817 in 1970 to a minimum of $555 in 1998. During the period from 1997 through 2001, the parties' joint federal income tax returns reported a 5–year annual averaged wages of $158,762 and adjusted gross income of $1,699,831.

{¶ 75} There is a marked disparity in the relative earnings and earning potential of each party; it is undisputed that plaintiff sacrificed her own earning potential to contribute to defendant's career advancement.

{¶ 76} Having considered all of the foregoing factors, the court finds that it would be reasonable and appropriate to make an award of spousal support to plaintiff of $1,460 per month. The first spousal support payment shall be due April 1, 2003, and shall continue thereafter until plaintiff's death, remarriage, cohabitation with another as if married but without the benefit of a ceremony, or further order of the court, whichever occurs first. The court expressly reserves jurisdiction to modify this award of spousal support.

{¶ 77} The foregoing award is for periodic payments of spousal support and shall be taxable to the plaintiff and fully deductible by the defendant.

{¶ 78} All spousal support payments shall be paid by wage withholding, plus administrative fees, through the Lucas County Child Support Enforcement Agency. If the parties agree, such payments can be made by means of an electronic transfer to a designated account of the plaintiff.

{¶ 79} All prior orders of the court including those pertaining to spousal support shall terminate on March 31, 2003. Any spousal support arrearage as of that date shall not merge in this decision or a subsequent judgment entry of divorce, unless otherwise provided.

## ATTORNEY FEES

{¶ 80} The plaintiff requested that the defendant be held responsible for 50 percent of her legal expenses. Plaintiff testified that from April 2001 through November 11, 2002, she has paid approximately $148,243 in attorney fees. She acknowledged that a portion of the paid expenses included legal expenses for pending actions filed against her by her children.

{¶ 81} The defendant testified that he had paid $46,854 in legal expenses and that there is an outstanding balance due of $3,232 as of August 26, 2002.

**24**

{¶ 82} As the Sixth District Court of Appeals pointed out in *Hyslop v. Hyslop*, 6th Dist. No. WD–01–059, 2002-Ohio-4656, 2002 WL 31002816:

"R.C. 3105.18(H) provides that a trial court may award reasonable attorney's fees to either party during any stage of a divorce proceeding. *However, attorney's fees are 'primarily the function of the party who retains the attorney.'* *Farley v. Farley* (1994), 97 Ohio App.3d 351, 358 [646 N.E.2d 875]. Therefore, in order to make such an award, the court must determine whether the payor has the ability to pay the attorney's fees it awards and whether either party would be prevented from fully litigating his or her rights and adequately protecting his or her interests if reasonable attorney's fees are not awarded. *Id.* The trial court's decision regarding attorney's fees must be equitable, fair, and serve the ends of justice. *Bowen v. Bowen* (1999), 132 Ohio App.3d 616, 642 [725 N.E.2d 1165]." (Emphasis added.)  Id. at ¶ 27.

{¶ 83} The court finds that plaintiff never asserted that she lacked sufficient assets and income to pay her attorney fees that were necessary and reasonable in order to protect her interests in the proceedings; the court further finds that plaintiff was not prevented from adequately pursuing and protecting her rights.  The court further finds that with the division of the marital assets, plaintiff does have the financial ability to provide for all of her own legal representation in this action.  Having considered the dictates of R.C. 3105.18(H), the court finds that equity and fairness requires that each party be responsible for their respective attorney fees.

{¶ 84} Counsel for the plaintiff shall prepare a judgment entry that sets forth the findings of fact and conclusions of law of the court as contained in this decision, as well as the stipulations of the parties, which judgment entry otherwise conforms to the procedural requirements of this court.

{¶ 85} That entry shall be submitted to counsel for the defendant within 20 days.  It shall be approved and submitted to this court within 10 days thereafter. In the event counsel are unable to agree upon any provision of the proposed entry, following a good-faith effort to resolve any disagreement, plaintiff's counsel shall submit the entry without defendant's counsel's approval immediately following the expiration of that 10–day period.  Plaintiff's counsel shall attach a letter setting forth the date the proposed entry was submitted to defendant's counsel, and certifying that a good-faith effort was made to resolve all disputes.  The letter shall also set forth the area(s) and/or issue(s) of disagreement, as well as a statement supporting the plaintiff's position on any disagreement.

{¶ 86} Within 10 days of the date of plaintiff's counsel's letter, defendant's counsel shall submit a proposed entry to this court.  Accompanying that proposed entry shall be a letter certifying that a good-faith effort has been made to resolve all areas of dispute, and setting forth the area(s) and/or issue(s) of dispute, and a

statement supporting the defendant's position on any disagreement. A copy of the proposed entry and the accompanying letter shall be served upon plaintiff's counsel.

{¶ 87} The parties shall equally share in the cost of this action. **NO FINAL RECORD**.

Judgment accordingly.