IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2004 Session

## ROBERT KENDALL BROADBENT v. SHARI KATHERINE LANGHI BROADBENT

**Appeal from the Circuit Court for Davidson County**
**No. 01D-1410      Marietta Shipley, Judge**

---

**No. M2003-00583-COA-R3-CV  - Filed August 24, 2005**

---

This appeal involves a dispute over the responsibility for investment losses incurred by a spouse before and during the parties' marriage. After only one year of marriage, the husband filed suit for divorce in the Circuit Court for Davidson County. The wife counterclaimed for divorce and, among other relief, sought alimony in solido to offset the loss of her separate property resulting from the husband's aggressive stock market trading. Following a bench trial, the trial court granted the wife a divorce on the ground of inappropriate marital conduct and then, employing a comparative fault analysis, determined that the husband should pay the wife $51,500 in alimony in solido to reimburse her for her separate property lost in the stock market. The husband has appealed. We have determined that the wife is not entitled to be reimbursed for the losses caused by the husband's investments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part and Affirmed in Part**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Robert Kendall Broadbent.

Rose Palermo, Nashville, Tennessee, for the appellee, Shari Katherine Langhi Broadbent.

### OPINION

### I.

Robert Kendall Broadbent and Shari Langhi began dating in July 1996. Mr. Broadbent, then thirty-two years old, worked for BellSouth Telecommunications. Ms. Langhi was twenty-nine years old and was employed as a kindergarten teacher. She was also a single mother, and she and her son lived in a condominium provided by her parents. In addition to paying virtually all of her housing expenses, Ms. Langhi's parents regularly gave her substantial gifts of money. Ms. Langhi placed

these funds in savings accounts and certificates of deposit because she planned to use them for her retirement.

When Mr. Broadbent first met Ms. Langhi, he was already aggressively managing the investments in his BellSouth stock plan. In April 1998, he persuaded Ms. Langhi that she could earn a greater return on her money if she invested it in the stock market as opposed to leaving it in savings accounts and certificates of deposit. Ms. Langhi was concerned about the risk, but eventually agreed to let Mr. Broadbent help her place some of her money in the stock market after her father advised her to make sure that Mr. Broadbent invested in blue chip stocks.

In April 1998, Mr. Broadbent helped Ms. Langhi open an investment account and an Individual Retirement Account. She deposited $30,000 in the investment account and $2,000 in the retirement account. She later deposited an additional $5,000 in the investment account, and by September 30, 1999, the value of her investments has grown to approximately $89,000. On October 1, 1999, apparently well satisfied with the growth of her investments, Ms. Langhi executed a limited power of attorney authorizing Mr. Broadbent to trade directly on her accounts. Three days later, she signed a Margin Agreement/Loan Consent Agreement allowing Mr. Broadbent to trade her accounts on margin.[1] Mr. Broadbent began trading on margin with Ms. Langhi's accounts, just as he had been trading with his accounts.

The parties married on December 4, 1999. By then, the margin debt on Ms. Langhi's investment account was approximately $51,500. It decreased to approximately $31,000 by December 31, 1999, and in early January 2000, Ms. Langhi deposited the remainder of her savings – approximately $51,000 – in her investment account. By January 31, 2000, the margin debt on her investment account had ballooned to approximately $125,000, but the net value of the account was $102,000.

The parties did not consolidate their living arrangements following their marriage. Ms. Langhi declined to move into Mr. Broadbent's residence because she found it uninhabitable. Mr. Broadbent did not desire to move into Ms. Langhi's condominium because it was too small. He tired of spending the night at Ms. Langhi's condominium and then returning to his house to dress in the morning. Both parties eventually agreed to purchase a new house, but they disagreed about how much house they could afford. Mr. Broadbent believed they could afford a house in the range of $480,000, but only if the stock market remained strong and if they had full use of the proceeds of the sale of the condominium where Ms. Langhi had been living. Accordingly, he began to trade even more aggressively in order to generate the money needed to purchase their dream home. Shortly after the parties married, Ms. Langhi made a $5,000 down payment on a $162,000 lot in Williamson

---

[1] The U.S. Securities and Exchange Commission defines "margin" as "borrowing money from your broker to buy a stock and using your investment as collateral. Investors generally use margin to increase their purchasing power so that they can own more stock without fully paying for it. But margin exposes investors to the potential for higher losses." *Margin: Borrowing Money to Pay for Stocks*, http://www.sec.gov/investor/pubs/margin.htm (last visited Aug. 23, 2005).

County. However, they lost the down payment when they were unable to make the second payment on the lot.[2]

The market value of Ms. Langhi's investment account peaked at $328,871 in March 2000. Even though the margin debt was $162,277, the net value of the account was $159,644. By this time, Mr. Broadbent had heavily invested Ms. Langhi in technology stocks. The value of these investments began to erode precipitously when the NASDAQ began to decline. By November 2000, the net value of Ms. Langhi's investment account was only $19,338.

The erosion of the parties' relationship paralleled the decline in Ms. Langhi's investments. Mr. Broadbent began mentioning divorce as early as February 2000. The parties tried counseling, but they separated briefly following a particularly difficult incident in October 2000. They separated for good in late January 2001, and Mr. Broadbent stopped trading Ms. Langhi's accounts at that time. At the time of the parties' final separation, the net value of Ms. Langhi's investment account was $34,239.

In May 2001, Mr. Broadbent filed a divorce complaint in the Circuit Court for Davidson County. Ms. Langhi filed an answer and counterclaim for divorce in August 2001. She asserted that Mr. Broadbent dissipated approximately $80,000 of her separate funds "to indulge his hi-tech gambling addiction by day-trading stocks on the Internet." Following a hearing in September 2002, the trial court entered an order on December 17, 2002 granting Ms. Langhi a divorce on the ground of inappropriate marital conduct[3] and reserving all other issues. On January 29, 2003, the trial court filed a memorandum opinion determining that Ms. Langhi was thirty percent responsible for the loss of her savings in the stock market but ordering Mr. Broadbent to pay $51,500 in alimony in solido to replace a portion of those losses. The court also directed Mr. Broadbent to pay $7,918.57 of Ms. Langhi's attorney's fees. Following the entry of a final decree in February 2003, Mr. Broadbent appealed.

## II.
### THE ALIMONY IN SOLIDO AWARD

The principle issue in this case is whether the trial court erred by awarding Ms. Langhi $51,500 in alimony in solido to replace a portion of her savings that Mr. Broadbent lost in the stock market during their marriage. Mr. Broadbent asserts that the court should not have awarded Ms. Langhi alimony in solido because there is no factual basis for concluding that he is more at fault for the investment losses than Ms. Langhi. We have determined that both Mr. Broadbent and Ms.

---

[2]By the time the second payment was due, the stock market had declined, and the parties learned that Ms. Langhi's parents were willing to give her only one-third of the equity in her condominium. The check that Mr. Broadbent wrote for the second payment on the lot did not clear the bank.

[3]In its later memorandum opinion, the trial court explained that Mr. Broadbent's inappropriate marital conduct consisted of his refusal to move into Ms. Langhi's apartment and "[h]is obsession with the stock market [that] ruined her savings and left her with virtually nothing."

Langhi must bear the responsibility for the investment losses and, therefore, that the $51,500 alimony in solido award cannot stand.

**A.**

There are no hard and fast rules for spousal support decisions. *Manis v. Manis*, 49 S.W.3d 295, 304 (Tenn. Ct. App. 2001); *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998); *Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn. Ct. App. 1996). Trial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount, and duration. *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Goodman v. Goodman*, 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999). Accordingly, appellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes. *Nelson v. Nelson*, 106 S.W.3d 20, 23 (Tenn. Ct. App. 2002); *Brown v. Brown*, 913 S.W.2d 163, 169 (Tenn. Ct. App. 1994). Our role is not to fine-tune a trial court's spousal support award, *Davidson v. Davidson*, No. M2001-01830-COA-R3-CV, 2002 WL 31769205, at *3 (Tenn. Ct. App. Dec. 11, 2002) (No Tenn. R. App. P. 11 application filed), but rather to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable. *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001).

Initial decisions regarding the entitlement to spousal support, as well as the amount and duration of spousal support, hinge on the unique facts of each case and require a careful balancing of all relevant factors, including those identified in Tenn. Code Ann. § 36-5-101(d)(1)(E). *Robertson v. Robertson*, 76 S.W.3d 337, 338 (Tenn. 2002); *Dube v. Dube*, 104 S.W.3d 863, 868 (Tenn. Ct. App. 2002); *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001). Among these factors, the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson v. Robertson*, 76 S.W.3d at 342; *Bogan v. Bogan*, 60 S.W.3d at 730; *Sullivan v. Sullivan*, 107 S.W.3d 507, 510 (Tenn. Ct. App. 2002). Of these two factors, the disadvantaged spouse's need is the threshold consideration. *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995); *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999).

**B.**

We have determined that the trial court's decision to award Ms. Langhi $51,500 in alimony in solido is based on faulty legal reasoning. The trial court imposed this obligation on Mr. Broadbent after determining that he was seventy percent responsible for the investment losses using a comparative fault analysis. This is not the proper test for determining whether Mr. Broadbent dissipated Ms. Langhi's savings.

Even though no statutory definition of "dissipation" exists, the term has a common meaning in the context of divorce. The concept of dissipation is based on waste. *Ward v. Ward*, No. W2001-01078-COA-R3-CV, 2002 WL 31845229, at *3 (Tenn. Ct. App. Dec. 19, 2002) (No Tenn. R. App. P. 11 application filed). Dissipation of marital property occurs when one spouse uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time

when the marriage is breaking down. *See, e.g.*, *In re Marriage of Cerven*, 742 N.E.2d 343, 348 (Ill. App. Ct. 2000); *Goodman v. Goodman*, 754 N.E.2d 595, 598 (Ind. Ct. App. 2001); *Allison v. Allison*, 864 A.2d 191, 195 (Md. Ct. Spec. App. 2004); *Kittredge v. Kittredge*, 803 N.E.2d 306, 317 (Mass. 2004); *Budnick v. Budnick*, 595 S.E.2d 50, 58 (Va. Ct. App. 2004). Dissipation involves intentional or purposeful conduct, *Stock v. Stock*, 693 So. 2d 1080, 1084 (Fla. Dist. Ct. App. 1997); *K v. B*, 784 N.Y.S.2d 76, 90 (App. Div. 2004), that has the effect of reducing the funds available for equitable distribution. *See In re Marriage of Miller*, 796 N.E.2d 135, 141 (Ill. Ct. App. 2003); *Goodman v. Goodman*, 754 N.E.2d at 598; *Jeffcoat v. Jeffcoat*, 649 A.2d 1137, 1142 (Md. Ct. Spec. App. 1994).

The factors that courts most frequently consider when determining whether a particular expenditure or transaction amounts to dissipation include: (1) whether the expenditure benefitted the marriage or was made for a purpose entirely unrelated to the marriage; (2) whether the expenditure or transaction occurred when the parties were experiencing marital difficulties or were contemplating divorce; (3) whether the expenditure was excessive or de minimis; and (4) whether the dissipating party intended to hide, deplete, or divert a marital asset. *Halkiades v. Halkiades*, No. W2004-00226-COA-R3-CV, 2004 WL 3021092, at *4 (Tenn. Ct. App. Dec. 29, 2004); *Wiltse v. Wiltse*, No. W2002-03132-COA-R3-CV, 2004 WL 1908803, at *4 (Tenn. Ct. App. Aug. 24, 2004) (No Tenn. R. App. P. 11 application filed); *Ward v. Ward*, 2002 WL 31845229, at *3; *see also Thompson v. Thompson*, 811 N.E.2d 888, 914 (Ind. Ct. App. 2004).

Whether a particular course of conduct constitutes a dissipation depends on the particular facts of the case. *In re Marriage of Cerven*, 742 N.E.2d at 348; *Solomon v. Solomon*, 857 A.2d 1109, 1112 (Md. 2004); *Kittredge v. Kittredge*, 803 N.E.2d at 316. The party claiming that dissipation occurred has the burden of persuasion and the initial burden of production. After the party alleging dissipation establishes a prima facie case that marital funds have been dissipated, the burden shifts to the party who spent the money to present evidence sufficient to show that the expenditures were appropriate. *Wiltse v. Wiltse*, 2004 WL 1908803, at *4; *see also Bratcher v. Bratcher*, 26 S.W.3d 797, 799 (Ky. Ct. App. 2000); *Turner v. Turner*, 809 A.2d 18, 52 (Md. Ct. Spec. App. 2002); *Anderson v. Anderson*, 514 S.E.2d 369, 380 (Va. Ct. App. 1999).

## C.

This case focuses on Mr. Broadbent's aggressive stock trading which was motivated, at least in part, by the parties' shared desire to obtain the funds to purchase their "dream home." Rather than attempting to deplete Ms. Langhi's savings, Mr. Broadbent was trying to increase them. His risky investment strategy was intended to earn a higher rate of return than Ms. Langhi had been earning. As the trial court found, Ms. Langhi had "probable knowledge of the stock market problems" and did not intervene until most of her savings were lost.

Parties who have entered into a marriage should share the benefits of the relationship as well as any risks and detrimental consequences stemming from those risks. *Geddes v. Geddes*, 530 So.2d. 1011, 1017-18 (Fla. Dist. Ct. App. 1988); *Mikhail v. Mikhail*, 791 N.E.2d 468, 474 (Ohio Ct. Com. Pl. 2003). Thus, mismanagement of family finances does not amount to dissipation. *Cornell v. Smith*, 616 S0. 2d 639, 630 n.3 (Fla. Dist. Ct. App. 1993); *Altman v. Altman*, No. M2003-02707-

COA-R3-CV, 2005 WL 819773, at *4 (Tenn. Ct. App. Apr. 7, 2005) (Tenn. R. App. P. 11 application pending). This is particularly the case when the other spouse has acquiesced in the disputed expenditure or conduct. *Askinazi v. Askinazi*, 641 A.2d 413, 416 (Conn. Ct. App. 1994); *Rosenfeld v. Rosenfeld*, 597 So. 2d 835, 836-37 (Fla. Dist. Ct. App. 1992); *Bojrab v. Bojrab*, 786 N.E.2d 713, 728 (Ind. Ct. App. 2003); *Kittredge v. Kittredge*, 803 N.E.2d 306, 316 (Mass. 2004).

The decision to invest money is an example of a financial risk in a marriage that may result in either profits or losses. Investments in the stock market are commonplace in today's society, and stock market losses are generally not considered to be dissipation, *Wilner v. Wilner*, 595 N.Y.S.2d 978, 980 (App. Div. 1993), even when a spouse's investment strategy becomes imprudent. *Nelson v. Nelson*, 795 So.2d 977, 983 (Fla. Dist. Ct. App. 2001); *Mikhail v. Mikhail*, 791 N.E.2d at 474. Both parties should share in subsequent losses caused by a spouse's speculation as they would share in the growth caused by that spouse's speculation. *See Wassif v. Wassif*, 551 A.2d 935, 940 (Md. Ct. Spec. App. 1989).

The trial court employed the wrong standard when it determined that Mr. Broadbent had dissipated Ms. Langhi's savings. In light of the evidence in this case, Mr. Broadbent engaged in, and Ms. Langhi acquiesced in, a risky investment strategy because they desired to purchase a new home. The decline in the stock market was not Mr. Broadbent's fault. Accordingly, he should not have been held responsible for the loss of Ms. Langhi's savings.

## III.
### THE ATTORNEY'S FEE AWARD

As a final matter, Mr. Broadbent asserts that the trial court erred by requiring him to pay seventy percent of Ms. Langhi's attorney's fees. He asserts that the record contains insufficient proof to warrant this award. We have determined that the trial court did not err by requiring Mr. Broadbent to pay a portion of Ms. Langhi's attorney's fees.

### A.

Civil litigants in Tennessee's courts are generally required to be responsible for their own attorney's fees in the absence of a statute or contractual provision otherwise. *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998); *Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 33 (Tenn. Ct. App. 2002). In domestic relations cases, three of the most common circumstances in which attorney's fees are appropriate include: (1) awards to economically disadvantaged spouses as spousal support, (2) awards to spouses who must return to court to enforce child support obligations, and (3) awards to spouses seeking to enforce a marital dissolution agreement when the agreement contains a provision for attorney's fees. *Elliott v. Elliott*, 149 S.W.3d 77, 88 (Tenn. Ct. App. 2004).

An award of attorney's fees to an economically disadvantaged spouse is usually characterized as alimony in solido. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002); *Wilder v. Wilder*, 66 S.W.3d at 894. Accordingly, a trial court considering a request for attorney's

fees must consider the factors contained in Tenn. Code Ann. § 36-5-101(d)(1)(E) (Supp. 2004), with the most important factors being the need of the economically disadvantaged spouse and the ability of the obligor spouse to pay. *Eldridge v. Eldridge*, 137 S.W.3d 1, 24-25 (Tenn. Ct. App. 2002); *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001).

Awards of attorney's fees as alimony in solido are largely discretionary with the trial court. Thus, the appellate courts will ordinarily not interfere with an alimony in solido award for attorney's fees unless the trial court did not appropriately exercise its discretion based on the facts. *Aaron v. Aaron*, 909 S.W.2d at 411; *Eldridge v. Eldridge*, 137 S.W.3d at 25. A trial court fails to exercise its discretion properly when its decision is not supported by the evidence, when it applies an incorrect legal standard, or when it reaches a decision which is against logic or reasoning that causes an injustice to the party complaining. *Biscan v. Brown,* 160 S.W.3d 462, 468 (Tenn. 2005).

**B.**

It is most likely not coincidental that the trial court required Mr. Broadbent to pay seventy percent of Ms. Langhi's legal expenses after it found that he was seventy percent at fault for the loss of most of her savings in the stock market. However, our decision to vacate the award of $51,500 does not necessarily require us to also vacate the attorney's fee award. Each of these awards stands on its own.

Ms. Langhi is economically disadvantaged compared to Mr. Broadbent. Even taking the generosity of her parents into consideration, Ms. Langhi has less earning power and ability to accumulate assets and savings than Mr. Broadbent. In addition, her financial contributions to the marriage in the form of most of her savings were far greater than Mr. Broadbent's contributions, and the weight of the evidence is that Mr. Broadbent is more responsible for the end of the marriage than Ms. Langhi. Accordingly, we have no factual or legal basis to second guess the trial court's decision to require Mr. Broadbent to pay seventy percent of Ms. Langhi's legal expenses.

**IV.**

We reverse the portion of the final judgment awarding Ms. Langhi $51,500 in alimony in solido, affirm the portion of the final judgment awarding Ms. Langhi $7,918.57 in attorney's fees, and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal in equal proportions to Robert Kendall Broadbent and his surety and to Shari Katherine Langhi for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.